(No. 65347.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DERRICK HOUSE, Appellant.

*Opinion filed December 20, 1990.*

MILLER, J., dissenting.

Randolph N. Stone, Public Defender, of Chicago (Jeffrey M. Howard, Assistant Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee G. Goldfarb, Assistant State's Attorney, and Gael O'Brien, Special Assistant State's Attorney, of counsel), for the People.

JUSTICE CALVO delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, the defendant, Derrick House, was found guilty of four murders, aggravated arson, residential burglary, home invasion, attempted armed robbery and four counts of armed violence. No sentences were imposed on the residential burglary or armed violence counts. On April 28, 1986, the court found defendant eligible for the death penalty, and ultimately sentenced him to death on

May 7, 1986. The death sentence has been stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603). We reverse and remand the cause to the circuit court for a new trial. The facts relevant to our disposition of this case are set forth below.

On January 12, 1985, the bodies of Raynard Rule, Lauren Rule and Yvonne Brooks were discovered by police officers and firemen in a second-floor apartment at 458 North Hamlin in Chicago, Illinois. Raynard Rule had died from hemorrhaging caused by multiple stab wounds to the chest. Lauren Rule and Yvonne Brooks had died as a result of hemorrhaging caused by gunshot wounds to the neck and head. All three victims had been bound and gagged. Burns were evident over substantial portions of the bodies and they bore the odor of kerosene. A fourth victim, Kim Brooks, escaped from the apartment. Although she had been burned over 37% of her body surface, Brooks survived approximately one month, eventually succumbing to sepsis caused by her severe burns. During that interval, she twice provided police with accounts of the crimes and once gave them a description of the perpetrators. She was never able to name or identify the individuals involved.

Defendant was arrested on February 5, 1985, after 16-year-old Charles Green gave a statement implicating him in the commission of the crimes. After spending a day and two nights in an interview room at the Harrison and Kedzie police station, defendant allegedly orally confessed to the crimes and was subsequently charged. On November 13, 1985, defendant filed a petition for severance of his case from that of Green, who was also charged. Defendant's request was granted on November 26, 1985. Thereafter, on January 6, 1986, defendant filed motions to quash his arrest and suppress statements he had allegedly made. In his motions, defendant claimed

that the police lacked probable cause to arrest him and that his alleged inculpatory statements were, in any event, involuntary. The court bifurcated hearing on defendant's motions, proceeding first on the issue of probable cause. This portion of defendant's motion was heard on January 7 and 8, 1986.

The first witness to testify was James Davis. According to Davis, he was recuperating at home from a gunshot wound to his leg when he was "picked up" by Detective Foley on February 3, 1985, taken against his will to the Harrison and Kedzie police station, and placed in a small room where six or seven police officers were present, none of whom he knew. Davis, who at the time had criminal charges pending against him, was detained for three hours, during which time he gave the police no information regarding defendant, but they imparted certain information to him which linked defendant to the January 12 fire at 458 North Hamlin. Davis said he did *not* tell the officers that, on January 11, 1985, defendant and Raynard Rule got into a fight in front of a game room at 750 North Lawndale. According to Davis, he was not even at the game room at 7 p.m. on January 11, 1985. He did not tell police Rule owed defendant money, nor did he tell them defendant displayed a gun that evening. He denied telling police that defendant and "Little Charles" were involved in the murders. Davis said the police wanted him to sign a statement implicating defendant and made promises to him in order to secure his cooperation, but he refused. Davis acknowledged that he had known defendant for about two years and that he was, at the time of his testimony, serving time in the Department of Corrections for attempted armed robbery, attempted burglary, residential burglary and unlawful use of weapons.

Defendant testified that he and Jonathan Douglas were at a game room at 750 North Lawndale on Febru-

ary 5, 1985, around 5:30 or 6 p.m. when eight or nine police officers came in, asked him and Douglas their names, then grabbed defendant's arm and handcuffed him. The police conducted a brief and unproductive search of the premises before they transported defendant and Douglas to the Harrison and Kedzie police station. Defendant said he was shown no warrant and was not told he was under arrest. He had not been violating the law at the time of his arrest. The police said they wanted to ask him some questions and, upon their arrival at the station, put defendant in a small room.

Detective John Summerville testified that he was involved in the investigation of a quadruple homicide which had occurred on January 12, 1985, at 458 North Hamlin in Chicago. The victims were Raynard Rule, Lauren Rule, Yvonne Brooks and Kim Brooks. On February 5, 1985, at 2 p.m., Summerville spoke with Charles Green. Detective Mike Miller was also present. According to Summerville, Green said he was asked by defendant and Teddy Bobo to go to Raynard Rule's second-floor apartment at 458 North Hamlin and get Rule to open the burglar gates on the front door of the apartment. Green agreed. While Green went up to the apartment door, defendant and Bobo hid in the hallway. When Rule opened the gates, defendant and Bobo pushed Rule back into the apartment. Defendant and Bobo began tying up Raynard Rule and the three women who were present. Defendant took Raynard into the kitchen, stabbed him, then took him into another room and set him on fire. When Green smelled smoke, he left by the front stairway of the building and, while descending the stairs, he heard several shots coming from the apartment. Green went directly to the game room on Lawndale where, a short time later, defendant arrived, saying he had just "burnt" Raynard Rule at "Big Daddy's" dope house on Hamlin.

At the time Green gave his statement, defendant was not in custody. Green identified a photograph of defendant. Summerville was personally aware of certain facts corroborating Green's statement and verified others with officers assisting in the investigation. Summerville said he knew at the time that there had been a fire, Raynard Rule's body had been burned, the female victims had been tied up, and handguns had been used. Detective Summerville knew that "Big Daddy" and Jeffrey Haggins—otherwise known as Bodine—were partners in the operation of the dope house. Summerville claimed Green was not under arrest when he gave his statement, notwithstanding an arrest report which indicated Green had been placed under arrest at 1 p.m.

Detective Mike Miller testified that he first became involved in the investigation on January 13, 1985, the day after the crimes were committed. Progress reports were made available to Summerville when Summerville returned from furlough. Miller was aware that Kim Brooks had given a description of the offenders to Detective Blomstrand. Brooks had said the two black men were approximately 30 to 35 years of age. One had a heavy build, medium complexion, and was known by the name of "Bo" or "Bodine." The other man was approximately 5 feet 7 inches tall, 145 pounds, dark-complected, with a mustache and "Jeri" curls. He wore a dark shirt, blue jeans, and beige shoes. Brooks said she thought there might have been a black female involved. Miller said he arrested Green on February 6, 1985.

To the extent defendant's motion was predicated upon a contention of lack of probable cause to support his arrest, the court denied his motion. On January 14, 1986, a hearing was commenced wherein the court heard evidence concerning the circumstances of defendant's initial detention during which he allegedly made inculpa-

tory oral statements. By agreement, defendant proceeded first.

Defendant testified that, after his arrest at the game room on Lawndale, he was taken to the police station at Harrison and Kedzie. Upon his arrival, he was taken to a small room containing only a table and two chairs. There were no windows in the room, nor was there a clock. Defendant estimated he was in the room a few days. Defendant was still handcuffed when Officer Greg came in and advised him that other officers would be coming in to talk with him.

Thereafter, Detective Summerville entered and asked defendant if he knew Virgil Bridges, Steve Reed or Raynard Rule. Defendant replied affirmatively in each instance. Summerville then asked defendant if he knew about a fire on Hamlin on January 12. Defendant said he had heard about it. According to defendant, Detective Miller entered and asked defendant if he was at 458 North Hamlin on January 12. When defendant said he was not, Miller handcuffed defendant to the wall, asked again, then walked out. Summerville told defendant he had better talk. Defendant claimed Miller reentered the room with a plastic bag, boxing gloves, clippers and a flashlight. When Miller resumed his questioning of defendant, Summerville walked out of the room. When defendant again denied being in the apartment house, Miller accused him of lying. Defendant said Miller then picked up the flashlight and hit him twice. Defendant testified that—amidst continued questioning by Miller and repeated denials of involvement by defendant—Miller literally put on the gloves and slapped him a few times in the face, opening a small cut inside his mouth, placed a plastic bag over his head, opened and closed the clippers near his pants, and poked him again with the flashlight.

When Miller had finished with defendant and had left the room, Summerville returned and advised defendant that unspecified others were saying defendant had been in the apartment house. Defendant continued to deny any involvement. Detective Clemmons questioned defendant to some extent. Defendant said the police did not read him his *Miranda* rights, but an assistant State's Attorney did when he questioned defendant the first evening defendant was in custody. The assistant State's Attorney also offered defendant pop and cigarettes, which defendant declined. Defendant claimed he spent the first night in the small room and, to the extent he slept, he did so while sitting on the floor with his arms and handcuffs hanging from the wall.

According to defendant, Summerville came in the next day and told him he should say he was in the house and he "could get a manslaughter charge." Summerville advised defendant that Green and Detective Miller had gone before the grand jury. A photograph was taken of defendant, and defendant was shown a photograph of Green. Defendant acknowledged that he knew Green.

Later in the day, Green was brought into the interview room and Miller told defendant to listen to what Green had to say. Green reiterated his testimony before the grand jury. Defendant accused Green of lying. Defendant was told "the girl" had identified a photograph of him at the hospital. After Green was taken out of the room, Miller asked defendant, "So you still going to stick to that?" Defendant replied affirmatively. Defendant claimed Miller responded by slapping him.

That evening, Summerville showed defendant a police report making reference to a knife and razor. Summerville told defendant if Rule had come at defendant with a razor, and if defendant had stabbed him in response, defendant could "get manslaughter." Summerville allegedly advised defendant that he "could throw everything

off on Bobo and put Green in the house too." Defendant declined. Summerville told defendant to think about it and left the room.

During his second night of custody, an officer checked on him and allowed him to use the washroom. According to defendant, this was the first time he had been allowed to use the washroom since his arrest. He spent the second night of custody as he had the first—on the floor, handcuffed to the wall.

The next morning an officer unknown to defendant came into the room, shocked defendant three times with a small black box, then walked out. Defendant never saw him again. Later that morning, Summerville returned and asked defendant if he had "thought it over" and if he was going to talk to the State's Attorney. Defendant said Summerville had prepared a statement for him which they went over several times. Clemmons came in and said, "That sounds good. You should tell the State's Attorney that." Although defendant refused to sign the statement, he did read it aloud, after which the detectives left. They returned with a ham sandwich, chips and pop, which defendant claimed was the first food he had been given since his arrest. Summerville again requested defendant's cooperation.

Later in the day, defendant talked with an assistant State's Attorney and signed a statement denying that he had ever been to the apartment in question. While defendant spoke with the assistant State's Attorney, Summerville sat at the other end of the table, shaking his head. When the assistant State's Attorney left, Summerville said, "You just signed your life away." Defendant spent the night in the lockup.

While in custody, he was never allowed to use the telephone. He was never told his mother was trying to contact him. He was not allowed to see her until his third night of custody.

Under cross-examination, defendant clarified his earlier testimony saying Miller had "bag" gloves, not "boxing" gloves. Defendant admitted he had sustained no bruises, marks or abrasions as a result of alleged police misconduct; however, he did tell a paramedic who examined him upon his arrival at Cook County jail that he had been beaten by the police. He could not recall telling an assistant State's Attorney that he had been treated well by the police, and specifically denied telling an assistant State's Attorney on February 7 that he had been "treated fine." Defendant acknowledged he had never complained to an assistant State's Attorney of mistreatment by Clemmons or Summerville on February 5, 6, or 7. Although defendant had claimed he could not sleep in the position in which he was handcuffed, he conceded he was asleep on February 6 when an officer came in and woke him up. He maintained he was not given food until February 7, and was not allowed to use the bathroom until late on February 6.

Detective Summerville did not advise him of his rights on February 5, but did on February 6. The assistant State's Attorneys did advise defendant of his rights and he indicated he understood. He knew most of his rights before February 5, but did not know he could request an attorney before questioning.

Detective John Summerville testified that he advised defendant of his rights when he arrested defendant on February 5, 1985. Clemmons was present at the time. When he spoke with defendant at the Harrison and Kedzie station at approximately 8 p.m., he again advised defendant of his rights. Defendant indicated he understood and would answer questions. Detective Miller was present. Summerville said he did not observe Miller mistreat or threaten defendant in any way. Summerville brought defendant a sandwich, chips and pop at 10 p.m.

on February 5, 1985, at which time he was allowed to go to the bathroom.

He next saw defendant at 8 a.m. on February 6 in the same interview room. Defendant was not handcuffed and was sleeping on the table. When defendant awoke, Summerville escorted him to the washroom, allowed him to make a phone call, wherein defendant referred to the other party as "Ma" or "Mom," then provided defendant with sandwiches and coffee. He advised defendant of his rights and spoke with him briefly.

Summerville next saw defendant sometime between 6:30 and 7 p.m. In the intervening time, Summerville and others had been taking statements from Charles Green and had brought him before the grand jury to testify. They were also looking for Teddy Bobo, another suspect. At 7 p.m., they brought Green into the interview room and instructed defendant to "sit there and listen." A conversation between Summerville and Green ensued, whereafter Green was taken from the room.

After defendant had been left alone a short time, Summerville returned with some food. After defendant finished eating, Summerville spoke to defendant, first advising him of his rights. The conversation began about 9 p.m. and lasted between 20 and 30 minutes. When Summerville emerged from his conversation with defendant, he informed two detectives and a sergeant that defendant had admitted stabbing Raynard Rule in self-defense. Defendant said he and Raynard argued in the kitchen of the apartment. Raynard went for a razor; defendant grabbed a knife and stabbed him.

Summerville met with defendant again at 8 a.m. on February 7, 1985, in the same interview room. Defendant was sleeping on the table when Summerville entered. Defendant was allowed to go to the washroom and was given food. He then spoke with Summerville for approximately one hour after Summerville had first advised him

of his rights. He gave a statement to Summerville during the one-hour conversation and thereafter repeated everything to Clemmons. The detectives did not present defendant a statement for him to sign. Assistant State's Attorney Brennan was called in and spoke to defendant. Defendant gave a different story to Brennan.

Although defendant was locked in the interview room overnight, he was not handcuffed. Summerville said he never saw defendant handcuffed to the ring on the wall and, for that matter, never saw defendant handcuffed from 8 p.m. on February 5 until defendant was taken to lockup late on February 7. Summerville took defendant to the washroom each morning and found defendant sleeping on the table when he entered the room.

Summerville denied that he had told defendant he could get manslaughter if defendant admitted to being in the apartment house. He denied telling defendant Brooks had identified him. He denied mistreating or threatening defendant. Summerville admitted he had lied to suspects he had questioned and had otherwise deceived them; however, he claimed he had not lied to defendant. Defendant was kept in the interview room approximately 49 hours. At least 64 hours elapsed before defendant was taken before a judge.

Detective Mike Miller denied that he had mistreated or threatened defendant. Miller was not aware of any time during the two days defendant spent in the room in which defendant was handcuffed to the ring on the wall. Miller said he was present on February 5 at 8 p.m. when Summerville advised defendant of his rights and defendant indicated he understood. Miller was present at 9:20 p.m. the same day when Assistant State's Attorney George Ellison spoke with defendant, and on February 6 at 7 p.m. when Charles Green and Summerville conversed in defendant's presence. Miller was not aware of any officers mistreating defendant.

Detective James Clemmons testified that he was present during a conversation between Summerville and defendant on February 7, 1985, at approximately 10:30 a.m. However, Clemmons never spoke to defendant on February 5, 6 or 7.

Assistant State's Attorney George Ellison testified that he interviewed defendant at 9:20 p.m. on February 5, 1985. Detective Miller was present. Ellison first advised defendant that he worked for the State's Attorney's office and then advised defendant of his *Miranda* rights, which defendant indicated he understood. Defendant said he understood and wanted to talk. Defendant gave a statement denying any participation in the crimes. Ellison told defendant what Green had been saying about him. When Miller left the room, Ellison asked defendant if he had been treated well by the police. Defendant said he had. Ellison saw no bruises, marks, or abrasions on defendant.

Assistant State's Attorney Thomas Brennan testified that he spoke with defendant at 2 p.m. on February 7, 1985. Detective Summerville was present. Brennan explained that he worked with the State's Attorney's office and he advised defendant of his rights. Defendant agreed to make a statement. Defendant's statement was not consistent with what Summerville had earlier told Brennan defendant had said. Brennan spoke with defendant alone after the detective had left and asked defendant whether he had been threatened, hit, or promised anything. Defendant said he had not. Brennan observed no bruises, marks or abrasions on defendant. Defendant said he had had something to eat. Brennan saw defendant walk to the washroom. He never saw defendant handcuffed.

Following Brennan's testimony, it was stipulated that Mark Essen, a paramedic employed by Cermak Health Service, would, if called as a witness, have testified that

he examined defendant on February 8, 1985. His report states, under the heading "chief complaint," "in good health." Under the category, "head injury," there is no notation.

The State rested.

Defendant called his mother, Rosalyn House, who testified that on February 5, 1985, sometime after 6 p.m., she was informed by a friend of defendant that defendant and Jonathan Douglas had been arrested. She called the police station and was told defendant was "just" being held for questioning. She did not receive a phone call from defendant. When she called the station again 30 to 40 minutes later, she was told defendant was still being held for questioning and would be home in about an hour. She went to the police station between 8 and 9 a.m. the next morning, approached the front desk and asked to speak with defendant. She was not allowed to see defendant and was told he would be home "in an hour or so." She went home and called once or twice later that day. Then, still on February 6, she returned to the station. She said she was told defendant had been charged with murder and that she could get him some clothes and something to eat, and could talk to him when she returned. She came back on the evening of February 7 and spoke with Detective Summerville, who informed her that defendant had been charged with murder.

Michelle House, defendant's sister, testified that she went to the Harrison and Kedzie police station with her mother the evening of February 7 and spoke with Detective Summerville, who said defendant had been charged with murder. Thereafter, she spoke with her brother. He complained that his legs and back were sore and that his mouth hurt. His eyes were a little swollen, but there were no bruises on his face. Initially, Ms. House testified defendant did not say he had been beaten by the police, but he did mention having been electrically shocked by a

police officer. Later, Ms. House testified defendant did say a police officer had hit him. Initially, Ms. House testified she did not seek medical treatment for her brother or complain to the police; however, later in her testimony she claimed to have complained about police beatings even before she saw her brother, having been advised of police misconduct by some of defendant's friends. Ms. House said Summerville refused to take a photograph of defendant to the hospital for Brooks to view. According to her, Summerville said, "I've tried to get him [defendant] to take a manslaughter."

Following Ms. House's testimony, defendant rested and the State introduced defendant's certified statement of conviction for attempted arson to be considered as it pertained to defendant's credibility and as to his knowledge of the criminal justice system.

Based upon the foregoing evidence, the court denied defendant's motion to suppress testimony concerning the statements he allegedly made at 9 p.m. on February 6 and 10:30 a.m. on February 7. The court specifically found the statements were not the product of coercion, intimidation or threats; no physical force was used against defendant. The court found defendant had been advised of his rights and that he is intelligent and familiar with the criminal justice system. The court found that the lapse of time between defendant's arrest and the statements, and the circumstances of his detention, did not taint the statements. After the court pronounced its ruling, trial commenced immediately thereafter.

Joe Dease, a Chicago police officer, testified that he was on patrol in his squad car at approximately 6 p.m. on January 12, 1985, when he received a radio message directing him to investigate a fire at 458 North Hamlin. He responded to that address, entered the building and walked upstairs to the second-floor apartment. Upon entering, he noticed a metal gate had been torn away from

the door of the apartment. The gate was still locked. Inside, he observed two burned bodies—identified by other witnesses as Lauren Rule and Yvonne Brooks—lying face down on a mattress, their hands tied behind them with an electric cord. Both victims had been gagged. Dease proceeded to a rear bedroom where, in a closet, he observed the body of a black male—identified by another witness as Raynard Rule—similarly bound, gagged and burned. Dease observed two stab wounds to Rule's chest. In the kitchen, Dease saw gas cans, an oil can, a razor, and a large knife upon which he observed blood.

While still in the apartment, Dease noticed the flashing lights of an ambulance outside. He went out the rear of the apartment, down a stairway and over to the ambulance. The time was approximately 6:15 p.m.

Inside the ambulance were two paramedics and a "victim," Kim Brooks. Brooks was lying on a stretcher while the paramedics cut away partially burned clothes from her body. As the paramedics removed the clothing, skin would peel off as well. Dease described Brooks' burns as "very severe," covering the entire exposed area of Brooks' body: face, head, arms and legs. Brooks' face had been burned so badly that "deep" tissues had been exposed.

Her burns were obviously very painful. She would "scream, talk a little, complain about being cold, talk a little, scream for help, complain about being cold." Dease spoke with Brooks for three or four minutes, asking her questions while she responded. Her responses were pained, loud, sporadic, punctuated by moaning and screaming.

According to Dease, Brooks told him she had been visiting in the second-floor apartment, and had fallen asleep in the front room, when she was awakened by an argument concerning money. Two men had entered the apartment. She heard Raynard tell whomever he was ar-

guing with to "tell Big Daddy I will have his money."
During the argument, she and two other girls—her sister
and her sister's friend—were kept in the front room by
the second man and were not allowed to leave. Later,
they were tied together with an electric cord and
gagged. The two other women were shot. Although a
shot was fired at her, it missed, and she "played dead."
One of the men then left the room and returned with a
flammable liquid which he poured over the women and
set ablaze. The perpetrators left in a hurry. Brooks said
she lay still a few moments to make sure they had gone,
then freed herself, ran out of the back door, down the
stairs and extinguished herself in the snow. Brooks told
Dease she did not know the offenders and did not give a
description of them.

Alice McMullen testified that she lived in a first-floor
apartment at 458 North Hamlin on January 12, 1985. At
approximately 5:45 p.m. on that date, she heard noises
like "pops," followed by noise on the back stairway. The
two to four "pops" she heard could have been gunshots.
Shortly thereafter, she discovered flames coming out of
the window of the second-floor apartment and called the
fire department. She was aware that the second-floor
apartment was a dope house. In the early morning hours
after the fire, around 3 or 3:30 a.m., she heard someone
coming up the front stairs past her apartment. When
she investigated, she got a glimpse of an individual who
had just left the building. She described the person as 5
feet 6 inches tall, 130 to 140 pounds, with curly "yellow"
hair.

Detective John Summerville was called as a witness
and testified that he spoke with defendant, alone, in an
interview room at approximately 9:30 a.m. on February
7, 1985, at the West Harrison police station. Summer-
ville said he first advised defendant of his rights.
Defendant indicated he understood. Summerville said he

started by asking defendant "about what he had told me earlier about what happened to him and Raynard in the kitchen." The previous evening defendant had mentioned "something about Raynard being stabbed in the kitchen." According to Summerville, defendant stated that he, Teddy Bobo and Charles Green went to the second-floor apartment. He and Bobo hid in the hallway until Green got Rule to open the burglar gates. Once the gates were open, defendant and Bobo entered the apartment, pushing Rule back inside. Once inside, defendant asked Rule for his package. Rule responded, "I don't owe you any money." Defendant said, "I won't be here if you didn't." Defendant took Rule into the kitchen, where they continued arguing. Lauren Rule went into the kitchen and tried to stop the argument. Bobo entered the kitchen, grabbed her, and took her back into the living room where he kept her and the other two girls. At some point during the argument, Raynard got a straight razor; defendant grabbed a knife and stabbed Rule twice in the chest. Bobo came in and asked if Rule was dead. Defendant said, "I think so." Bobo then said, "We got to kill the whores." The girls panicked and tried to flee, but could not because the burglar gates were locked. Bobo bound the girls and gagged them. Bobo told defendant to kill them. Defendant fired at one. Bobo fired at the second, and defendant fired at, but missed, Kim Brooks. All three girls fell onto a mattress on the floor. Bobo went behind a door and returned with a can of kerosene which he poured on the girls. Bobo then set them on fire. Green unlocked the front door and went out; defendant and Bobo ran out the back door, returning to the game room at 750 North Lawndale.

When defendant finished speaking, at 10:30 a.m., Summerville asked defendant if he would reiterate his story to another officer. Summerville testified that defendant agreed to have Detective Clemmons present

for a second conversation. The substance of this conversation was essentially the same as the first. Then Summerville asked defendant if he would tell the State's Attorney "the exact same thing." Defendant refused. Nonetheless, an assistant State's Attorney was called in after defendant's oral statement. When defendant later spoke with an assistant State's Attorney, at 1:50 p.m. on February 7, he did not tell the assistant State's Attorney what he had told Summerville. Defendant had previously denied involvement on February 5 when Summerville had first interviewed him.

When he talked to defendant on February 7, Summerville already knew that Raynard Rule had been stabbed, the girls had been shot, and all had been burned. Having already spoken to "Big Daddy" and Jeffrey Haggins—also known as "Bodine"—Summerville knew that Big Daddy and Bodine were, according to Big Daddy, partners in the "dope house" located in the second-floor apartment. Bodine was Big Daddy's "muscle," an enforcer who would pick up money and drop off drugs. Raynard Rule was the "house man," selling drugs from that location. Summerville knew that Bodine had been interviewed and that Bodine's fingerprints had been found on gas cans at the scene.

Although Summerville knew that guns had been used in the commission of the offenses, he did not ask defendant any questions pertaining to the make or caliber of the guns, nor did he inquire as to their whereabouts. He did not ask defendant what he was wearing during the offenses, nor did he ask what became of defendant's clothing. He did not ask defendant how much, if any, money was taken during the crimes or if any drugs were taken. He did not ask what was used to tie up the people in the apartment. He did not ask defendant for a description of the apartment. Summerville knew there was

no evidence linking defendant to the crimes other than Charles Green's statement.

Detective James Clemmons testified that he was present at 10:30 a.m. on February 7, 1985, when defendant gave a statement outlining his involvement in the murders at 458 North Hamlin. His account of defendant's statement was substantially the same as that to which Summerville testified. An assistant State's Attorney came in to speak with defendant not long after defendant gave his oral statement. Defendant gave a written statement at that time in which he denied any involvement in the incident. The latter statement was the only written statement signed by defendant.

It was stipulated that Dr. Diane Skala-Barnett would, if called as a witness, have testified that she performed autopsies on the bodies of Raynard Rule, Lauren Rule, Yvonne Brooks and Kim Brooks. The post-mortems performed on the first three victims were conducted on January 13, 1985. All three were extensively burned, had been gagged and had their hands tied behind their backs with electric cord. The bodies smelled of kerosene. Raynard Rule had received two stab wounds to the chest, causing his death. Lauren Rule had died from a gunshot wound to the neck. Yvonne Brooks had died of two gunshot wounds to the head and neck. Kim Brooks' autopsy was performed on February 17, 1985. She had sustained burns over 37% of her body surface. Brooks experienced multiple organ failure prior to death. She died of sepsis caused by her burns.

Allen Osoba, an employee of the Chicago police department crime laboratory, would have testified, if called as a witness, that he sampled vials of liquid taken from empty cans found at the scene of the crimes and that the residue therein was kerosene. Pamela Fish, also an employee of the crime lab, would have testified that no blood was found on the black-handled razor which was

submitted for analysis; however, a kitchen knife with an eight-inch blade revealed the presence of type O blood, the same blood type as blood submitted to her and identified as that of Raynard Rule.

Testimony regarding Kim Brooks' statement to Officer Dease was admitted under the spontaneous declarations exception to the hearsay rule. Various exhibits were admitted. The State rested. Defendant's motion for directed verdict was granted in part and denied in part. Defendant's motion was granted as it pertained to seven counts of armed violence; three counts of attempted armed robbery corresponding to each of the female victims; and felony-murder counts predicated upon attempted armed robbery as to those victims.

Defendant opened his case in chief by calling Detective Thomas Blomstrand as a witness. Blomstrand testified that, on January 12, 1985, at approximately 5:45 p.m., he was notified of a fire at 458 North Hamlin and responded to that location. Upon his arrival, he met with Officer Dease and was informed that a victim of the fire, Kim Brooks, was in an ambulance at the scene. Subsequently, at approximately 8:30 p.m., Blomstrand interviewed Brooks at Cook County Hospital. Brooks was in the burn unit in critical condition. She was bandaged and appeared to be in pain. She was, however, alert and responsive. Although he was not present when Brooks arrived at the hospital, Blomstrand interviewed her at the first opportunity. He was aware of no interviews prior to his.

The court sustained the State's hearsay objection and rejected defense counsel's argument that testimony as to Brooks' statements should be allowed as testimony relating spontaneous declarations. Defense counsel maintained he had laid an adequate foundation for admission of Brooks' statement to Blomstrand. The following colloquy ensued:

"THE COURT: Because a person makes a statement in pain does not mean it is a spontaneous declaration, and then you have got the testimony out of this witness that the victim, Kim Brooks, was alert and responsive, no difficulty in speaking. You have to meet the standards of that.

DEFENSE COUNSEL: The standard is that she was under the influence of the traumatic condition.

THE COURT: No, that is not my understanding, Counsel."

The court held the foundation laid by defense counsel insufficient to support admission of Brooks' statement as a spontaneous declaration in that Brooks' condition had not been sufficiently established. The court allowed Blomstrand's testimony as to Brooks' statement only to show what Blomstrand did in the course of his investigation. Following the court's ruling, Blomstrand was excused to be recalled on January 28, 1986.

Dr. Richard Kagan, a surgeon at Cook County Hospital, testified that he first saw Kim Brooks in the burn unit of the hospital on January 13, 1985. He was her attending physician. Dr. Vani Vijakumar was the first doctor to see and treat Brooks upon admission to the hospital. At the time of trial, Dr. Vijakumar was practicing in Ohio. When Kagan first saw Brooks, he discussed with her what had transpired from the time of her admission. He reviewed hospital records or reports concerning her treatment. He consulted with Dr. Vijakumar.

He learned that Brooks had arrived at the hospital at approximately 6 p.m. on January 12. He knew she had been bound and gagged and had escaped from a smoke-filled room. She had been burned over 40% of her body. Upon her arrival at the hospital, she was given oxygen and intravenous fluids. Her bladder and stomach were catheterized. Dressings were applied to her burns and she was given some medications, one of which would

have been a pain-killer. The fire department report stated she had been given two milligrams of morphine on the way to the hospital. That amount of morphine would have had a minimal effect on her, if any. Kagan believed it was "highly likely" that a person who had spent some time bound and gagged in a smoke-filled room would have had some degree of hypoxia, characterized by loss of orientation, progressing to agitation and eventually coma. This condition would have been remedied in a few minutes through oxygen therapy. He could not say whether Brooks was suffering from hypoxia upon admission. Kagan did not treat Brooks on January 12; he was aware of her condition only through medical records and conversations with Dr. Vijakumar. Dr. Vijakumar said Brooks was responsive to questions upon her arrival at the hospital.

At the conclusion of Dr. Kagan's testimony, the State moved to strike it in its entirety as "rank hearsay." Arguing that the doctor's use of charts and reports had nothing to do with an "ultimate diagnosis," but was rather an attempt to bring in Brooks' hearsay statements as substantive evidence, the State contended defense counsel was "improperly using hearsay exception of reports of other doctors upon which a doctor can rely [sic] his own opinion on." The State maintained that only Dr. Vijakumar could testify as to Brooks' condition prior to the statements for purposes of gaining admission under the spontaneous declarations exception to the hearsay rule.

Defense counsel confirmed that he was indeed attempting to use Kagan's testimony, in conjunction with medical reports, in the manner indicated by the State. The court took the matter "under submission."

The following day, defense counsel apprised the court that he had been under the "impression" that the State would stipulate to medical reports and that the parties

"would be dispensing with a lot of the bringing in of the experts and so forth and stipulating to their testimony." Defense counsel then embarked upon a "tale of woe" during the meandering course of which it became painfully clear defense counsel had not sought to interview hospital personnel who would have had personal knowledge of Brooks' physical and mental condition during the relevant time period immediately after Brooks sustained her injuries. Counsel stated his belief that he would not "have to bring in anybody from the hospital." He further stated his belief that he would have to locate Dr. Vijakumar in Ohio and fly her to Chicago if the court refused to allow foundational evidence by way of information taken from medical reports and elicited through Dr. Kagan. Counsel further requested that the court provide funds to fly the witness back from Ohio.

The State denied having ever agreed to stipulate to any medical reports involving Kim Brooks, and argued that defendant, represented by retained counsel, had not been shown to be indigent and was, therefore, not entitled to money to transport the witness back from Ohio.

Prior to addressing the issues argued by the parties, the court asked defense counsel whether he could fit the facts of his case within the framework for spontaneous declarations established by case law. The court expressed particular concern over the extended time lapse between the startling event and the statement of Kim Brooks, and the fact that the statement to be admitted was made at a location other than the scene of the crimes. The court made no ruling upon the matters raised by the parties pending submission of the case law requested.

Blomstrand resumed the stand on January 18. He testified Brooks was not crying when he first met her. Although she did cry later on, and at one point said, "I really hurt," she was coherent and able to speak audibly.

She spoke carefully. She did not say she was about to die, nor did medical personnel tell her that in his presence.

Blomstrand went on to recount Brooks' version of events in the apartment on January 12. She said she was asleep in the apartment, which served as a dope house, when the larger of the two offenders woke her up and led her into the kitchen with the other girls and Raynard. One of the offenders said they were there to collect money Big Daddy owed them. They demanded money and guns. They tied up the girls and Raynard with "light cord" and began a search of the apartment. Upon finding a gun, one intruder said they had warned Raynard not to hold back on them and the intruder held a cocked gun to Raynard's head. They first led the girls into the living room, then one of the men took Raynard into the rear of the apartment, following which Brooks heard a series of screams from Raynard. The man returned from the back room, picked up a can of kerosene, and took it to the back of the apartment. Brooks soon after smelled smoke. She told the other girls not to worry because she was tied loosely and they would be able to get out safely after the men left. Thereafter, the men were again together in the living room, standing behind the girls, who were facing the front windows. One of the men shot Yvonne in the head, and she fell; the other man shot Lauren in the head, and she fell. Then one of the men fired a bullet which Brooks heard go by her ear. She fell over and "played dead." The offenders poured kerosene on the girls, set them on fire and ran out the back door.

She said she had gotten a good look at both men. In her statement, she described her assailants: both were 30 to 35 years of age; the taller offender was 5 feet 8 or 9 inches tall, fat, and was called "Bo" or "Boo" by the other individual; the shorter man was approximately 5

feet 7 inches tall, thin, 140 pounds, dark-complected, and wore his hair in long "Jeri" curls. Blomstrand admitted he had written "Bodine" rather than "Bo" or "Boo" in his report; however, he insisted at trial Brooks had not used Bodine's name. Bodine had worked at Big Daddy's dope house; his name was in Raynard Rule's phone book; and his fingerprints were found in the apartment.

Blomstrand further testified that on January 16, 1985, he was told that someone had been solicited to "fire up" the dope house, but he could not recall who had given him that information. Three days later, on January 19, a "stop order" was issued for Bodine. The stop order was cancelled on January 24 after Bodine had been interviewed. Blomstrand did not show a photograph of Bodine to Kim Brooks. Although several photographs were shown to Brooks during the course of the investigation, Bodine's was never included. Another stop order was issued for Bodine on February 1, 1985, after a man named Donald Grigsby had been interviewed. Bodine was never arrested and was dead by the time of trial. Teddy Bobo was arrested; however, his case was nol-prossed on the State's motion prior to trial.

Following Blomstrand's testimony, defense counsel requested that Blomstrand's testimony—previously admitted only to show what the officer did in the course of his investigation—be admitted as substantive evidence to prove the truth of matters asserted therein. The court again heard arguments as to the admissibility of Kim Brooks' hospital statements as spontaneous declarations. Thereafter, the court rendered its ruling as follows:

> "The question is whether or not the reflective faculties of Kim Brooks was still so that the reflective faculties had no control over her. There obviously must be an [u]mbilical cord, in quotes, between the event and the utterance.

The time element, of course, is a factor that has to be determined. In this case, it was two hours or perhaps a little more. There must be no, the Court must consider whether or not there is any intervening matters that came forth which caused a break between the event, in connection between the event and the statement.

In this case, there will be one statement prior, to a police officer, I believe Dease, on the scene, in about 30 minutes. That is a factor that, of course, has to be considered.

And, the condition of [Kim Brooks]. I think everyone admits that she was in a pretty serious, in a grave situation.

The question is whether or not she knew it. And there is no testimony there; except, there was testimony that she was wrapped up in a lot of clothes.

She knew that she had been burned to some extent. She died about a month later, I believe, after that.

I am concerned about whether or not the connection itself can be so handled in this fashion and I don't think it can be.

I think there was sufficient intervening events that caused a break such that it could not be admitted and as a spontaneous declaration being as a factor.

And I further believe that two hours is a little bit too long. And I would call your attention to People versus Jackson, 9 [Ill. 2d] 484, statement made at least one hour after the stabbing."

The day after the court's ruling, prior to the taking of testimony, defense counsel once again informed the court of the difficulties he had encountered in attempting to contact Dr. Vijakumar, whom he represented to be "the only medical personnel [sic] that was present during the treatment of Kim Brooks." Counsel also bemoaned his inability to obtain nurses' notes from Cook County Hospital. The court responded, "We can address that a little bit later on. I do not think it needs to be addressed right now." Defendant continued with the presentation of other aspects of his case.

Donald Grigsby testified that he went to the second-floor apartment at 458 North Hamlin in the late afternoon or early evening of January 12, 1985. He had stopped on the way to get his friend, Raynard, a bag of marijuana. Grigsby had been to the apartment once or twice previously. Upon his arrival on the day in question, Grigsby was met at the door by a young woman; Raynard let him in. Raynard locked the burglar gate after he entered. Inside, it "looked like they were getting ready to move." There was a lot of furniture stacked in the room. Grigsby said he gave Raynard the marijuana, stayed about five minutes, then left through the front door.

As he was leaving, he saw Bodine and another man coming upstairs. The other man had "curls" and a mustache. He appeared to be in his late twenties and stood about 5 feet 7 inches tall. Grigsby later learned there had been a fire at Raynard's within a half hour of his leaving.

Although Grigsby initially claimed he did not know Raynard was selling drugs from the apartment, he later admitted that Raynard was the "house man" at Big Daddy's dope house and that Raynard was selling drugs from that location. Grigsby admitted he knew Derrick Pearson, also known as "Big Daddy," and Jeffrey Haggins, also known as "Bodine." He admitted he had previously been convicted of unlawful use of weapons.

Grigsby, who had known defendant for a couple of years, admitted he had not gone to the police on January 12, 1985, even though he knew his friend, Raynard, had died. He said he failed to do so because he was scared of Bodine. He had spoken with Big Daddy and Bodine shortly after the fire, a fact of which he had informed the police. Grigsby said it was not until January 29—when he was taken to the police station against his

will—that he told the police about having seen Bodine at the top of the stairs shortly before the fire.

Sterling Buchanon, Jeffrey Haggins' stepbrother, testified that he (Buchanon) was in Stateville Correctional Center on January 12, 1985. He was released on January 14, 1985. He was aware of the fire and murders on Hamlin. On January 16, he got together with Bodine, Charlie Hill, Larry and "Mr. T" and smoked some "reefer." Bodine was, at the time, working for Big Daddy and had recently worked with Raynard Rule. Bodine had been selling drugs for Big Daddy and overseeing the dope house on Hamlin. Raynard was the doorman. After Larry and Mr. T left, Buchanon asked what had happened at Hamlin.

Following an objection by the State, arguments were heard and cases were submitted pertaining to the admissibility of testimony concerning any statements Bodine might have made to Buchanon. The court permitted defense counsel to proceed with his examination of Buchanon with the understanding that it would be considered an offer of proof. Buchanon chose to continue his testimony despite warnings that his testimony might tend to incriminate him.

Buchanon testified he was in the basement of his mother's house on the evening of January 16, 1985, with Bodine and Charlie Hill "getting high." Charlie Hill was about 5 feet 7 inches tall, 175 to 180 pounds, muscular, dark-complected, with long "carefree" curls and a mustache. Larry and Mr. T had left. Buchanon overheard Bodine tell Charlie that Raynard was a stool pigeon, put in a top spot to watch him. Raynard had previously worked at one of Big Daddy's dope houses on Arlington. Buchanon said he asked Bodine if he knew anything about the murders at the dope house where he worked. Bodine replied, "[T]he less you know the better off you is." Bodine and Charlie started to discuss the matter be-

tween themselves. Charlie told Bodine, "[B]etter get rid of the clothes, because you throwed that shit everywhere. It got on me, on my pants, my shoes and everything \*\*\*." Buchanon said they lowered their voices for a time and he could not hear what they were saying. Buchanon said he then overheard Charlie say, "[Y]ou should've called the nigger back upstairs 'cause he could put is [*sic*] in the building." Bodine allegedly replied, "Oh, don't worry about him. He ain't going to say nothing." Once again, Bodine and Hill lowered their voices so Buchanon could not overhear. Thereafter, Bodine went upstairs and returned with a roll of clothing which smelled of fumes. When Buchanon expressed interest in a sweater therein, Bodine said, "Yes, it's pretty, but got to get rid of it." As Charlie Hill was leaving, he told Bodine, "[G]et rid of the .38 and the shotgun and I get rid of the other pipe."

After Hill had left, Buchanon rolled a "joint" and went back to the alley where Bodine was burning in a garbage can what appeared to be the sweater and blue jeans Buchanon had seen earlier. As Buchanon handed Bodine the joint, Bodine stirred the items in the can to facilitate their incineration.

When the two returned to the basement, Buchanon chastised Bodine for allowing Hill to exert so much influence over him. Buchanon allegedly said, "[I]f you all was involved in the shit on Hamlin, don't make no sense for all those people getting killed and get no shit out of it." Bodine replied, "[I]t just didn't go the way we planned \*\*\* just didn't mean for it to happen like that."

The next evening, Buchanon was in a garage stripping a stolen car when Bodine came in carrying a one-shot, sawed-off shotgun. He said, "[W]atch my back \*\*\* I am fittin' to take care of something." He then walked out of the garage and into a vacant lot. Later, he returned and said he was finished.

According to Buchanon, about a week later he was talking to another stepbrother when he noticed a picture of a "cute girl" on the fireplace. He asked who she was and was supposedly informed, "Calvin's girlfriend *** she got killed in the Hamlin thing back in January." The stepbrother called her "Bonnie." Buchanon said he asked for and received permission to take the photograph. Later that evening, he showed Bodine the picture and asked him if he recognized her. He replied, "[Y]es, one of the bitches with Raynard." Buchanon said, "Do you know who that is? That's Calvin's girlfriend. Our stepbrother." Bodine allegedly replied, "That bitch shouldn't have been up there."

Two or three days later, Buchanon was helping Bodine put some tires on his car when Charlie Hill drove up and told Bodine, "[Y]ou know that bitch still alive?" Bodine said, "[D]on't worry. She in a coma." Hill replied, "[S]he the only one can identify us." Bodine assured Hill he kept "tabs on the broad." Hill said, "[I]f worse come to worse, we will go up in the hospital and get her."

The court ruled Buchanon's testimony inadmissible as substantive evidence because the statements were made too long after the crimes; the statements were ambiguous with no clear admission by Bodine; there was insufficient independent evidence to corroborate the statements; and, although Bodine was apparently dead and unavailable to testify, Charlie Hill was "still available." Referring to Hill, the court stated, "I don't know that as a more credible witness that might be able to testify to the declaration of confession." The court did not—contrary to the State's representation otherwise—find that Buchanon was not a credible witness.

The court, referring to the criteria for admissibility of third-party confessions, stated:

"The four elements must come together. It is not one of three, if any of them are left out. If you feel you're

short on any one of them, perhaps we could wait a little longer on that."

Continuing with its case, the defense called Jonathan Douglas. Douglas testified that he was at the game room at 750 North Lawndale on January 12, 1985. He left around 5 p.m. to look for some cough syrup. When he left, defendant was still at the game room. On his way back to the game room, he saw the fire trucks on Hamlin and stopped for a while at the scene of the fire. He returned to the game room about 6 p.m. and told his brother, Sam, and defendant about the fire. He, Sam and defendant walked down there to see what was happening. Douglas estimated walking time from the game room to 458 North Hamlin to be about 5 to 10 minutes. Douglas said he had known defendant for seven or eight years and would do defendant a favor if asked to do so. He admitted to having been convicted of theft and attempted arson.

Samuel Douglas testified that he was at the Lawndale game room on January 12, 1985, from 2:30 to 6 or 6:30 p.m. Defendant was also there during that time period. Samuel Douglas, his brother, Jonathan, and defendant left sometime after 6 p.m. to see what was happening at 458 North Hamlin. Douglas said he is a friend of defendant. He admitted he had been convicted of burglary.

Vicki Travis testified that she was at the Lawndale game room at approximately 5:30 p.m. on January 12, 1985, and spoke with defendant at that place and time. Defendant was at the game room from 5:30 to 6:45 p.m. Although she had not previously volunteered that information to law enforcement officials, she had told others about it. She did not smell kerosene on defendant that day. On January 12, defendant had a little hair around his upper lip; he did not wear his hair in curls. Travis said she did not see Charles Green at the game room that day. She knew who Raynard Rule was, but had

never seen him with defendant. Travis had known defendant for four or five years.

Sandra Glover, defendant's girlfriend, testified that she arrived at the game room a few minutes after 6 p.m. on January 12, 1985. Defendant was already there. Jonathan Douglas came in a few minutes after she did and told Sam Douglas and defendant that Sam's building was on fire. Defendant, Jonathan and Sam left at 6:35 p.m., headed toward Huron. She did not see Charles Green at the game room that day.

Dionne Coleman testified she saw defendant in front of the game room at approximately 4:30 p.m. on January 12, 1985. She took him a pie at 5 p.m. in consideration of his having helped her grandmother with groceries. She saw defendant later around 9:30 p.m. She did not see him in between. Defendant's hair was cut short. Coleman could not recall anything unusual about defendant's clothes. She did not see Charles Green that day.

Defendant testified in his own behalf, initially explaining the circumstances of his confinement at the police station. He said on February 7, 1985, at approximately 9:30 a.m. he was confined in a small room at the station, and had been so confined since February 5. At that time, Detective Summerville showed him a statement Summerville had written out. He said Summerville wanted him to put Green and Bobo in the house. Summerville told him if he said what Summerville told him to say he could get manslaughter. Defendant denied ever having told Summerville he had stabbed Raynard Rule in self-defense. Defendant said he read the statement aloud to Summerville a few times, but insisted he "wouldn't say it." After defendant read the statement over a few times, Summerville called Detective Clemmons into the room and instructed defendant to "say it again," which defendant did. Defendant again told them he "wasn't going to say that." Clemmons told him to "say it to a

states attorney," but defendant refused. By stipulation, defendant's testimony from his suppression hearing was added as evidence.

Later, on February 7 at 1:50 p.m., defendant spoke with an assistant State's Attorney who asked defendant some questions, which defendant answered. Summerville was present. In his signed statement, defendant said he was at the game room on Lawndale from 4:30 to 6 or 7 p.m., at which time he left to see about the fire on Hamlin. He was not inside the residence at 458 North Hamlin on January 12, 1985, and did not commit the crimes therein perpetrated. He had been to the building before, but on the day in question he had been at the game room all day, except for a 5- or 10-minute period when he went across the street to get something to eat.

Defendant said on January 12, 1985, he was 19 years old, 5 feet 7 inches tall, and weighed between 180 and 200 pounds. He has a tattoo of a top hat and a cane on his right arm, which symbolizes membership in the Vice Lords. On January 12, 1985, he was a member of the Vice Lords.

Defendant said he had known Raynard Rule for four or five years. He knew Raynard had an apartment on Hamlin. He did not see Raynard at the game room on January 11 or 12. Raynard did not beat him up. Defendant said Raynard was "all right with me." He never saw Raynard in 1985. Defendant said he recognized Lauren Rule from a photograph shown him, but he did not see her on January 12.

Defendant testified he did not know a person by the name of Jeffrey Haggins, or Bodine; nor did he know Derrick Pearson, although he had heard of Big Daddy. He said he did not see or speak to Charles Green on January 12, 1985, and did not pay him to help open the burglar gates at the apartment on Hamlin. Neither did he

see James Davis on January 12, 1985. He never told Davis he was going to "peep" Raynard.

Following defendant's testimony, it was stipulated that Dennis O'Neill would have testified that he is an employee of the Chicago police department and is qualified to analyze fingerprints. Fingerprints taken from two kerosene cans found in the apartment were submitted to him for analysis, as were Green's, Bobo's and defendant's fingerprints. No matches were found with any of the three named individuals; however, prints taken from the cans did match those of Raynard Rule and Jeffrey Haggins (Bodine). Other prints remained unidentifiable, but suitable for comparison.

Defendant rested, with the understanding that he would be allowed to call Dr. Vijakumar as a witness if defense counsel could contact her.

In rebuttal, the State recalled Detective John Summerville. Summerville said he spoke with Samuel Douglas at the Harrison and Kedzie police station on the evening of February 5, 1985, at which time he questioned Douglas regarding the homicides at 458 North Hamlin. Douglas said he went to the Lawndale game room at 2:30 p.m. on January 12, 1985. He stayed until 7 p.m., at which time he went to the building where he lived to. check on the fire. Summerville claimed Douglas had said he went there alone, apparently because Douglas had not mentioned going with anyone. Summerville conceded there was no indication in his report that Douglas had said he had gone alone.

Detective Vic Switski testified that he spoke to Donald Grigsby at 5 p.m. on January 29, 1985. The topic of discussion was the multiple homicide at 458 North Hamlin. Switski said Grigsby told him he was admitted to Raynard's apartment on January 12 by a black female approximately 18 years of age. Raynard and three black females were in the apartment. When he left, as he was

exiting the building, he saw Bodine at ground level. Grigsby said Bodine was with a black man between 25 and 28 years of age, 5 feet 7 inches tall, 165 pounds, medium complexion, with a mustache. When initially questioned, Grigsby denied knowing Bodine. He eventually acknowledged that he knew him, but then claimed he had not seen Bodine at the apartment.

After the detectives had testified, it was stipulated that the court could consider the testimony of certain witnesses from defendant's "suppression" hearing of January 14 and 15, 1986. The testimony to be considered included that of Detectives Summerville, Miller and Clemmons, Assistant State's Attorneys Brennan and Ellison, and Mark Essen, a paramedic. The State concluded its case by presenting defendant's certified statement of conviction for attempted arson.

Following closing arguments, the court, on February 4, 1986, found defendant guilty of the four murders and the attendant charges noted at the outset of this opinion, for the most part rejecting the testimony of defendant and his witnesses as unbelievable, "confusing and conflicting," and finding credible that of the State's witnesses—in essence the detectives who testified to defendant's alleged oral statements of February 6 and 7, 1985. The State gave notice of its intent to seek the death penalty.

Due to defendant's indigence, counsel formerly *retained* by defendant was, on February 24, 1986, *appointed* to represent him. By order entered March 21, 1986, the Cook County public defender was appointed as additional counsel.

On April 4, 1986, defendant filed a motion for new trial. Included among the points raised in support thereof were defendant's claims that the court erred in denying his motions to suppress the alleged oral inculpatory statements; the court erred in not *physically* sever-

ing the trials of defendant and Charles Green so as to have separate trials before different judges; the court erred in excluding testimony concerning Kim Brooks' statement to Detective Blomstrand; the court erred in excluding testimony concerning third-party admissions to the commission of the crime and destruction of evidence by individuals connected with drug operations at the scene; the State failed to develop exculpatory evidence when it had the opportunity of doing so, in that photographs of neither defendant nor others previously implicated were shown to Brooks before her death; and the State failed to tender a complete set of medical reports which would have revealed "favorable material and additional witnesses previously unknown to the defense."

Defendant's motion was first heard on April 14, 1986. Although defense counsel argued several points raised in defendant's motion, most of his argument was devoted to what counsel believed to be the State's failure to tender a complete set of medical reports. That failure, counsel suggested, deprived defendant of vital information concerning the identity of hospital personnel who attended Kim Brooks and who could have provided testimony pertaining to her physical and emotional condition shortly after her admission to the hospital. Such testimony, counsel continued, would have provided the foundation he needed to gain admission of Brooks' statement to Blomstrand. Counsel admitted the State had "tendered what they had" and that the State "did not receive a complete set." Counsel also conceded that Dr. Kagan, the chief surgeon, was initially unaware that any nurses' notes existed, and only later discovered them in the file. Further, counsel represented that he had eventually obtained the virtually illegible notes and could make out only the signature of one nurse whom he had contacted and with whom he was arranging an interview.

Counsel suggested that persons with knowledge of the Hamlin murders were being killed, presumably to assure their silence. He represented to the court that Bodine had been killed two months after the crime in a shootout in a bar, and that Sterling Buchanon had since been murdered.

The court denied defendant's motion, but allowed defense counsel one day to contact the nurse whom he wished to interview.

On April 15, 1986, defense counsel filed an affidavit in support of defendant's motion for a new trial. In this affidavit, defense counsel noted he had been prevented from presenting certain evidence tending to establish that others had committed the offenses, "due to what the Court at that time felt was the lack of a proper foundation to allow such evidence under exceptions to the hearsay rule." Counsel claimed he had, since the time of trial, "been made aware of" witnesses and evidence which would tend to establish a sufficient foundation for the evidence excluded. Counsel represented to the court that the outcome of the trial would have been different had the excluded evidence been admitted. Discovery of the aforementioned evidence and witnesses was, counsel claimed, not due to a lack of diligence. Additionally, counsel restated his belief that there had been additional murders since the time of trial "of persons either implicated or alleged to have knowledge regarding these offenses." The affidavit stated those matters were "under continuing inquiry and investigation." According to counsel, two "sources" had, since the time of trial, indicated that an individual known only as " 'Punkin' has knowledge of and may have been involved in the instant offenses," but "Punkin" would not come forward until another unnamed individual was taken into custody.

The court gave defense counsel until the following day to obtain "a report." The next day, April 16, the

court, at defense counsel's urging, gave counsel until April 23 to procure the information counsel claimed he needed. On April 23, counsel appeared with unsigned affidavits requesting additional time to obtain signatures. The following colloquy ensued between defense counsel and the court:

"DEFENSE COUNSEL: Some matters came up at the hospital that are not within my control and it has to go through a chain of command.

THE COURT: You don't know whether there is evidence that is newly discovered. You are looking for evidence, is that correct?

DEFENSE COUNSEL: Judge, there are witnesses—

THE COURT: You are looking for evidence?

DEFENSE COUNSEL: Yes I am Judge. I have found evidence. There are witnesses that contradict the testimony of the police officers, regarding the foundation. These—

THE COURT: I have seen nothing in this record so far that would indicate that."

Given counsel's representations that he could "get [an affidavit] signed tonight," the court continued the matter until the next day.

On April 24, 1986, counsel filed the affidavit of Joan Jones, a nurse who had assisted in the treatment of Kim Brooks upon her arrival at Cook County Hospital and had knowledge of her condition at, or close to, the time Brooks spoke with Detective Blomstrand. The affidavit states that Jones was on duty when, at 6:30 p.m., Brooks was brought to the hospital. Brooks had sustained full and partial thickness burns to the face, hands, upper and lower extremities, buttocks and back. Her hair was singed and her clothing was charred. She was hysterical and in severe pain upon arrival, and was taken directly to the intensive care unit because of the extent of her burns. Brooks was given a Phisoderm wash during the course of which clothing and burned skin was cut

away and removed. Antibacterial cream, dressings and bandages were applied. A catheter was inserted into her bladder and a tube was inserted into her stomach through her nose. She was given intravenous fluids. During the course of emergency treatment, which lasted approximately one hour, she was often hysterical, and always very emotional, agitated, continuously crying, screaming and in great pain. Her condition was critical and she was never left unattended. She had sustained burns over approximately 40% of her body. Police officers were allowed to speak to her in intensive care following her initial treatment. She was given morphine, which, at the initial doses, had little effect. She continued to cry and frequently complain of severe pain. She appeared very nervous, upset, excited, distraught, restless, anxious and apprehensive for the remainder of the evening. Jones left the hospital at approximately 11:15 p.m. on January 12.

In addition to Jones' affidavit, counsel stated he could obtain signed affidavits from two other witnesses "within the next couple days unless [he became] involved with other matters." Counsel argued the affidavits would demonstrate that Detective Blomstrand was "not entirely truthful regarding his answers to questions propounded to him about the physical condition of Kim Brooks at the hospital." These witnesses could provide a proper foundation for admission of Brooks' statement in which she gave descriptions of the offenders which did not fit the defendant.

Counsel then reiterated his oft-stated claim that he "was lead to believe there would be stipulations as to the medical reports, as well as the Medical Examiner's reports." He chronicled his unsuccessful attempts to bring in physicians with firsthand knowledge of Brooks' condition in the hours immediately after her admission. He stated he had been "under the belief that a full set of

medicals had been tendered by the State," a belief which had been reinforced by information obtained from Dr. Kagan, who said that nurses' notes usually ended up in wastebaskets and were not available. It does not appear from the record that the State was in possession of the notes, or that the State was even aware of their existence. Defendant's motion for discovery did not clearly request the notes. Counsel concluded by reiterating his vacuous allegations regarding an unnamed individual who, according to counsel, had unspecified knowledge of the offense.

The court rejected defendant's argument that the State had violated its duty of disclosure; it noted that counsel had still not produced an affidavit from "Punkin" detailing the substance and relevancy of his knowledge, if any; and, although the court's ruling on the newly discovered evidence of Brooks' post-offense condition, *i.e.*, Jones' affidavit, is less than clear, it would appear to us the following comments of the court would support its ruling:

> "It would seem to me that that [*sic*] there should have been some effort in the direction of ascertaining what those nurses' statements were, or at least if you felt that that might be of that importance, to bring it up sometime prior to the time of trying the case. At least they should have been talked to."

The court denied, *in toto*, defendant's motion for new trial.

On April 25, 1986, defendant waived a jury for purposes of sentencing. The court found defendant eligible for the death penalty on April 28 and, on May 7, 1986, sentenced him to death.

On appeal, defendant raises a multitude of issues. We need address only the following: (1) whether Charles Green's custodial statement to police provided probable cause to arrest defendant; (2) whether defendant's state-

ments to police were involuntary; (3) whether Kim Brooks' statement to Detective Blomstrand was admissible under the spontaneous declarations exception to the hearsay rule; (4) whether her statement was admissible under the dying declarations exception; (5) whether the State violated rules of discovery by failing to tender nurses' notes; (6) whether testimony concerning extrajudicial statements and actions of Bodine and Charles Hill should have been admitted as substantive evidence; (7) whether there was sufficient evidence to prove defendant guilty beyond a reasonable doubt; and (8) whether defendant received effective assistance of counsel.

We must reject defendant's first contention. Defendant contends, not that the information provided by Green was insufficient to furnish probable cause, but that Green's "custodial" statement was unreliable. Irrespective of our views regarding the circumstances of Green's detention, we believe Green's statement could be considered reliable under the totality of the circumstances. *People v. James* (1987), 118 Ill. 2d 214, is dispositive.

First, Green admitted his own involvement in the crimes, "something which common sense indicates one does not do lightly or falsely. Thus, the overall reliability of his statement[ ] is enhanced." (*James*, 118 Ill. 2d at 224.) Second, as in *James*, the record in defendant's case does not reveal that Green was offered any specific inducement for identifying defendant and Bobo as his accomplices. As this court observed in *James*:

"[H]e had nothing to gain by providing false information for, once the falsehood was discovered, he would have to suffer the consequences of misleading the police. As one court put it, a person 'who knows the police are in a position to charge him with a serious crime will not lightly undertake to direct the police down blind alleys.' (*United*

*States v. Davis* (D.C. Cir. 1979), 617 F.2d 677.)" (*James*, 118 Ill. 2d at 224.)

By charging that defendant was involved in the crime, Green was not absolving himself of criminal responsibility. His statement provided police with evidence to hold him on a murder charge. Moreover, the danger of fabrication is generally considered to be less in a probable cause setting than would be the case at trial. (*James*, 118 Ill. 2d at 224-25.) Furthermore, the reliability of Green's implication of defendant is "further supported by the independent verification of a substantial part of his statement by the facts learned through police investigation." *James*, 118 Ill. 2d at 225.

We must stress that probability of criminal activity, rather than proof beyond a reasonable doubt, is the standard for determining whether probable cause is present. (*People v. Tisler* (1984), 103 Ill. 2d 226, 236.) Under the totality-of-the-circumstances test of *Illinois v. Gates* (1983), 462 U.S. 213, 230, 76 L. Ed. 2d 527, 543, 103 S. Ct. 2317, 2328, which this court adopted in *Tisler*, 103 Ill. 2d at 245-46, we cannot say the circuit court erred when it found Green's statement provided probable cause for defendant's arrest.

A thornier issue is presented in defendant's claim that the inculpatory statements attributed to him were involuntary. Apparently conceding that his claims of physical abuse at the hands of the police were matters of credibility to be resolved by the circuit court, defendant, on appeal, argues that the circumstances of his confinement were such that his will was overborne. Since the circuit court apparently resolved conflicting testimony in favor of the State, we will analyze this issue using the testimony of State witnesses and the uncontroverted testimony of defendant.

Defendant was arrested at 6 p.m. on February 5, 1985. He was advised of his rights and was transported

to the Harrison and Kedzie police station, arriving there sometime between 6 and 8 p.m. He was placed in an interview room where he would remain for the next two days, except for brief intervals when he was allowed to go to the bathroom. The room was less than elegantly furnished, with a table and two chairs. There were no windows, nor was there a clock.

Summerville first spoke with defendant at 8 p.m. on February 5. He advised defendant of his rights, which defendant indicated he understood. Defendant said he would answer questions. Defendant denied any involvement in the Hamlin murders. Assistant State's Attorney Ellison also interviewed defendant on the evening of February 5. Defendant again denied involvement. At 10 p.m., Summerville brought defendant a sandwich, pop, and chips. Defendant was allowed to go to the bathroom at that time.

When Summerville next saw defendant, at 8 a.m. on February 6, defendant was sleeping on the table in the interview room. He was not handcuffed. All law enforcement officials stated defendant was never handcuffed, but was locked in the room. When defendant woke up, Summerville escorted defendant to the washroom and allowed him to make a phone call, evidently to his mother, as he referred to the person called as "Ma" or "Mom." Defendant was then given sandwiches and coffee. At 9 or 9:30 a.m., Summerville spoke with defendant again after advising defendant of his rights. Defendant denied involvement in the Hamlin offenses. For lunch, defendant was given a sandwich, chips and pop.

Summerville spoke with defendant again at 7 p.m. the evening of February 6. Detective Miller and Charles Green were also present. Defendant was instructed to "sit and listen" to what Green had to say. After Green and Miller had gone, defendant was allowed a short time alone, whereafter Summerville brought him something to

eat. At about 9 p.m., after defendant had eaten, Summerville advised defendant of his rights and spoke with defendant for approximately 20 to 30 minutes. According to Summerville, defendant admitted stabbing Rule in self-defense when, during the course of an argument, Rule "went for a straight razor." This was the first time defendant had admitted any involvement. Defendant had been in the interview room approximately 25 hours. Summerville did not present defendant with a statement to sign, nor did he summon a court reporter or State's Attorney.

Summerville resumed his questioning of defendant at 9 or 9:30 a.m. the morning of February 7 after defendant, who had been sleeping on the table, was fed and allowed to use the washroom. Defendant was first advised of his rights. According to Summerville, defendant proceeded to confess to the Hamlin offenses. Summerville called Detective Clemmons in to hear what defendant had to say. Summerville denied telling defendant he could get a manslaughter charge if he said he was in the house. Although Summerville admitted he had previously used deception and lied to other suspects when questioning them, he denied telling defendant the surviving female victim had identified him.

When Assistant State's Attorney Brennan spoke with defendant at approximately 2 p.m. on February 7, defendant signed a written statement denying any involvement in the Hamlin crimes. Defendant was removed from the interview room and taken to lockup at 7 p.m. that evening. Defendant had spent approximately 49 hours in the interview room. From Summerville's testimony, it appears that defendant was allowed to use the bathroom three times in that period. He had given his first inculpatory statement after 25 hours in the room, and his confession after 37 hours. The earliest time in

which defendant would have been taken before a judge was 64 hours after his arrest.

Defendant claims, on appeal, that his will was overborne because he was kept in a "stark physical environment for such a lengthy period of time," was subjected to repeated questioning, was held incommunicado, except for a single short telephone call, and was not taken before a judge in a timely fashion.

Before we endeavor to review and apply the law to the facts of this case, we must acknowledge the importance of the competing interests inherent in the issue at hand. The latitude which we allow police officers in interrogating a suspect must reflect an appropriate balance which protects the waning rights of the suspect, while not unduly hindering those engaged in the difficult and often thankless task of solving crimes and protecting the public. Resolution of this issue is no simple determination likely to yield a result satisfying to all. This is so because those on both sides of the controversy over the permissible limits of interrogation have valid arguments at their disposal. (See W. LaFave & J. Israel, Criminal Procedure §6.1, at 261-62 (1985).) We will here review some of those which have been compiled by LaFave and Israel.

The need for interrogation and confession in criminal investigation and prosecution was addressed by Justice Frankfurter in *Culombe v. Connecticut* (1961), 367 U.S. 568, 6 L. Ed. 2d 1037, 81 S. Ct. 1860. Those comments bear particular relevance to the case at bar.

> "Despite modern advances in the technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent human witnesses to such offenses, nothing remains—if police investigation is not to be balked before it has fairly begun—but to seek out possibly guilty witnesses and ask them questions, witnesses, that is, who

are suspected of knowing something about the offense precisely because they are suspected of implication in it." (*Culombe,* 367 U.S. at 571, 6 L. Ed. 2d at 1040, 81 S. Ct. at 1861.)

Continuing in the same vein, one commentator has stated:

"1. Many criminal cases, even when investigated by the best qualified police departments, are capable of solution only by means of an admission or confession from the guilty individual or upon the basis of information obtained from the questioning of other criminal suspects.

\* \* \*

2. Criminal offenders, except, of course, those caught in the commission of their crimes, ordinarily will not admit their guilt unless questioned under conditions of privacy, and for a period of perhaps several hours.

\* \* \*

3. In dealing with criminal offenders, and consequently also with criminal suspects who may actually be innocent, the interrogator must of necessity employ less refined methods than are considered appropriate for the transaction of ordinary, everyday affairs by and between law-abiding citizens." (Emphasis omitted.) Inbau, *Police Interrogation—A Practical Necessity,* 52 J. Crim. L., Criminology & Police Sci. 16, 16-19 (1961).

Opposing those who are convinced of the overriding importance of confessions, and who, consequently, favor granting police broad leeway in interrogating suspects, are those who fear that abuses may occur in the secrecy of the interrogation room and unreliable confessions may result. As was noted in *Miranda v. Arizona* (1966), 384 U.S. 436, 448, 16 L. Ed. 2d 694, 709, 86 S. Ct. 1602, 1614, police interrogation takes place in privacy which "results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation room." As LaFave and Israel observe:

"Because of this secrecy (for some a sufficient indication in itself of abuse), there is lacking sufficient empirical evidence to assert with confidence what always, usually, or often occurs in the course of police interrogation. This being so, attention has often turned to celebrated cases of confessions later proved false or to judicial opinions (including many Supreme Court decisions) revealing outrageous police tactics. Those favoring restrictions upon interrogation rely heavily upon these cases, while their opponents claim such incidents are extraordinary, having no relation to the ordinary day-to-day operations of the police." W. LaFave & J. Israel, Criminal Procedure §6.1, at 262 (1985).

While we agree "that a system of criminal law enforcement which comes to depend [too much] on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation" (*Escobedo v. Illinois* (1964), 378 U.S. 478, 488-89, 12 L. Ed. 2d 977, 985, 84 S. Ct. 1758, 1764), a system which relies not at all upon the confession will, in many instances where extrinsic evidence is lacking or inconclusive, be incapable of protecting society from perhaps the most cunning criminal elements which threaten it. In those cases to which Justice Frankfurter referred, where even diligent police work cannot turn up conclusive extrinsic evidence, the police must be allowed some latitude in attempting to obtain a confession through interrogation. To be effective, a certain amount of time in privacy is required, which in turn results in a gap in our knowledge as to what has transpired. This gap is usually filled by a defendant's testimony of abuse, coercion, and impropriety, and the officers' testimony of propriety and rectitude. As our system of justice is founded on a trier of fact who hears witnesses testify, observes their demeanor, and judges their credibility, we must rely upon the trier of fact to determine who is telling the truth.

The solution is not to do away with or unduly limit interrogation—an undoubtedly effective aid to crime-solving and one which even the Warren Court was reluctant to restrict despite its criticism in *Miranda*—but to fully explore the circumstances of an interrogation which has yielded an inculpatory statement, so as to determine whether constitutional safeguards were adhered to, and whether defendant's will was overborne, thereby rendering his statement involuntary.

This court has held that a statement is made voluntarily where, under the totality of the circumstances, it is given freely, voluntarily and without compulsion or inducement. A statement is involuntary if defendant's will was overcome at the time he confessed. (*People v. Redd* (1990), 135 Ill. 2d 252, 292; *People v. Kincaid* (1981), 87 Ill. 2d 107, 119.) Factors to consider when making a determination of voluntariness include the age, education and intelligence of the accused, the length of the detention and the duration of the questioning, whether the accused was advised of his constitutional rights, and whether the accused was subjected to any physical mistreatment. (*People v. Terrell* (1989), 132 Ill. 2d 178, 198; *People v. Martin* (1984), 102 Ill. 2d 412, 427.) The question of the competency of a confession is for the trial court alone to decide by a preponderance of the evidence, and its findings will not be disturbed by a court of review unless they are against the manifest weight of the evidence. (*Redd*, 135 Ill. 2d at 292-93.) Having considered all the circumstances of defendant's confinement, we cannot say that the circuit court's ruling on this issue was against the manifest weight of the evidence. Our decision is buttressed by apposite case law.

*In re Lamb* (1975), 61 Ill. 2d 383, presented a factual scenario similar to the one with which we are confronted. Lamb, although not a stranger to the criminal justice system, was nonetheless a juvenile, unlike defend-

ant, who was an adult, 19 years of age. Lamb was taken into custody at approximately 8 p.m. on May 25, 1972, and, upon his arrival at the police station, was placed in a small interrogation room and briefly questioned. One of his wrists was then handcuffed to the wall and Lamb was left sitting in a chair until 7:30 the next morning. He was able to sleep "off and on." On the morning of the 26th, Lamb was fed, briefly questioned, then taken to the scene of the murder where, later that morning, he orally admitted his participation and gave details of the crime. About 5 p.m., Lamb was returned to the interrogation room at the police station. Following further questioning, Lamb again orally admitted his participation and agreed to make a written statement. He was given food around 8 p.m. His signed, written statement was taken at approximately 9:45 p.m. in the presence of law enforcement personnel, a court reporter, and his mother. Lamb's mother was allowed to speak with him prior to the taking of the written statement. Lamb orally admitted participation in the crime within 16 hours of being taken into custody. Much of that time was spent alone in the interrogation room. He had been in custody 26 hours when he gave his written statement. He was fed only twice during the 26-hour period. Although this court condemned "the police practice of leaving suspects handcuffed in a chair all night" (*Lamb*, 61 Ill. 2d at 388), it nonetheless held Lamb's confession voluntary (*Lamb*, 61 Ill. 2d at 389).

In *People v. Nicholls* (1969), 42 Ill. 2d 91, 101, defendant claimed he had been illegally detained for 34 hours, unfulfilled promises of leniency had been made to him and "psychological pressures" had been applied to make him confess. Noting that the State's witnesses had denied making promises to defendant or coercing him, that the record disclosed Nicholls had "proper sleep and food" and that he "was not questioned continuously,"

this court upheld admission of defendant's confession, holding that the period of defendant's detention was merely "a circumstance to be considered in determining if [the] confession was voluntary." *Nicholls*, 42 Ill. 2d at 101; see also *People v. Carter* (1968), 39 Ill. 2d 31, 38 (defendant's confession admissible although he confessed after 32 hours in custody).

Although we must, as this court did in *Lamb*, 61 Ill. 2d at 388, condemn a police practice—in this case that of holding suspects for lengthy periods in interview rooms not equipped with basic facilities—we must, as in *Lamb*, 61 Ill. 2d at 389, nonetheless uphold the circuit court's determination that defendant's statements were voluntary.

As was the case in *Lamb*, defendant spent one night sleeping in the interview room before he gave his first inculpatory statement which, while not a full confession, placed him at the scene of the execution-style murders, stabbing one of the victims. Assuming, *arguendo*, defendant committed the murders and was thus aware of the facts surrounding their commission, he must have realized after his first statement that his avowals of innocence were becoming increasingly untenable. According to the detectives, defendant was not handcuffed, as was the case in *Lamb*, where the juvenile spent the night sleeping in a chair while handcuffed to a wall. (*Lamb*, 61 Ill. 2d at 388.) As in *Lamb*, 61 Ill. 2d at 389, defendant was repeatedly informed of his constitutional rights; yet defendant did not request counsel. As in *Lamb*, 61 Ill. 2d at 389, defendant did not, according to the assistant State's Attorney who interviewed him, complain of mistreatment or coercion at the hands of the police. Questioning was intermittent, rather than continuous and intensive, and there "is no evidence that defendant was led to believe he could or would be held indefinitely if he did not confess." (*People v. Mallett*

(1970), 45 Ill. 2d 388, 393.) Although the physical amenities provided defendant were in our view less than he should have been afforded, he was nonetheless allowed to sleep and to use the washroom, and he was given food at regular intervals. See generally *Nicholls*, 42 Ill. 2d at 101.

Although, as we have indicated, the deprivation of basic facilities is a factor to be considered against the State, the "stark environment" of the interview room is not so weighty a factor as defendant contends. A jail cell is hardly a paradise for the senses, yet defendants properly processed and charged can be held there for lengthy periods of time.

We further reject defendant's allegation that he was held incommunicado. According to Summerville, defendant was allowed a telephone call, which he apparently placed to his mother. He was thus able to notify her of his whereabouts so that she could make arrangements for him which he could not make for himself. He did not have the right to have her, or any other members of his family, present during interrogation or even visit with him while in custody other than at regular visiting periods. *People v. Prim* (1972), 53 Ill. 2d 62, 69.

We now turn to the duration of defendant's detention in the interview room. Although we do not believe this factor, considered with others present here, should render this defendant's statement involuntary, and although we realize that the drawing of a bright line would be unworkable given the totality-of-the-circumstances standard we must apply, this is perhaps the appropriate case to caution the police regarding brinkmanship. Given even a slightly different set of circumstances, the result might very well have been different. Having said that, we find here that the length of time defendant was detained prior to his statements (25 and 37 hours) is not such a great departure from established precedents that it re-

quires suppression of defendant's statements. See *Lamb*, 61 Ill. 2d at 388 (first oral admission made 16 hours after arrest; written statement given 26 hours after arrest); *Nicholls*, 42 Ill. 2d at 101 (34 hours); *Carter*, 39 Ill. 2d at 38 (confessed after 32 hours in custody).

We are somewhat troubled by the delay in presenting defendant to a magistrate. However, as this court observed in *Carter*, 39 Ill. 2d at 38-39, the fact that the defendant in that case was held in custody without being taken before a magistrate until he confessed 32 hours after his arrest did not *per se* void his confession. Although section 109—1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 109—1(a)), and its predecessor (Ill. Rev. Stat. 1961, ch. 38, par. 660), require that a person arrested without a warrant be taken before a magistrate "without unnecessary delay," " 'noncompliance therewith does not necessarily obviate a conviction nor render an otherwise voluntary confession inadmissible at the trial.' " (*Carter*, 39 Ill. 2d at 39, quoting *People v. Taylor* (1965), 33 Ill. 2d 417, 422.) This court has consistently held such delay does not of itself vitiate a confession but is merely a factor to be considered on the question of voluntariness. (*People v. Dees* (1981), 85 Ill. 2d 233, 237; *People v. Underhill* (1967), 38 Ill. 2d 245, 251.) Indeed, this court has held that the legislative directives of section 109—1(a) " 'cannot mean that police officers forsake all other duties to comply, and neither can they mean that the police do not have reasonable latitude to fully investigate a crime.' " *Mallett*, 45 Ill. 2d at 392-93, quoting *People v. Jackson* (1961), 23 Ill. 2d 274, 280.

While defendant probably was not taken before a magistrate prior to 64 hours of incarceration, his last inculpatory statement was allegedly made after 37 hours. The damage had been done. Defendant fails to demonstrate what, if any, prejudice he incurred from the addi-

tional 24-hour delay. This is, of course, required by *Dees*, 85 Ill. 2d at 241, a case in which the defendant failed to show a 14-day delay had prejudiced him. We find no prejudice here.

In conclusion, we hold that the circuit court's ruling, that defendant's statements were voluntary, was not against the manifest weight of the evidence. We turn now to evidentiary questions which arose at trial and are now issues raised by defendant on appeal. Subsumed in one such issue is a question regarding discovery which we will address within this context at an appropriate point in our discussion.

However, we will first dispose of defendant's contention that Kim Brooks' statement to Detective Blomstrand qualified as a dying declaration. As the State correctly points out, the central issue in determining whether a statement is a dying declaration is whether the declarant believed he or she was dying. The rule is that the declaration must be made under the "fixed belief and moral conviction" of the person making it that his or her death is "impending and certain to follow almost immediately." (*People v. Beier* (1963), 29 Ill. 2d 511, 515.) As was true in *Beier*, there is nothing in this record which would indicate that Brooks had been told she was going to die or that she believed she was going to die. *Beier*, 29 Ill. 2d at 515.

Although Brooks' statement to Blomstrand cannot qualify as a dying declaration, admission as a spontaneous declaration, or excited utterance, is another matter. The requirements for admissibility under this exception to the hearsay rule are: (1) the occurrence of an event sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) a statement relating to the circumstances of the occurrence. (*People v. Gacho* (1988), 122 Ill. 2d 221, 241; *People v. Poland* (1961), 22 Ill. 2d 175, 181.) Several fac-

tors have been used to determine whether the declarant's statement was in fact spontaneous, excited, and unreflecting. Time is one factor, albeit an elusive one, whose significance will vary with the facts of each case. (*People v. Nevitt* (1990), 135 Ill. 2d 423, 444; *People v. Shum* (1987), 117 Ill. 2d 317, 343.) Other factors to be considered include the nature of the event, the mental and physical condition of the declarant, and the presence or absence of self-interest. *Nevitt*, 135 Ill. 2d at 444-45; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.3, at 552 (4th ed. 1984).

Wigmore states the general principle of the exception as follows:

"[U]nder certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or at least as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him ***." 6 J. Wigmore, Evidence §1747, at 195 (Chadbourn rev. 1976).

As noted in one commentary, the thesis underlying the exception "has not been without its critics." (4 J. Weinstein & M. Berger; Weinstein's Evidence §803(2)(01), at 803—86 (1988).) Critics contend that, while the startling event may ensure sincerity, it is also likely to distort the observer's perception and memory, thus rendering the declarant's observations unreliable. Imwinkelried, *The Importance of the Memory Factor in Analyzing the Reliability of Hearsay Testimony: A Les-*

*son Slowly Learnt—and Quickly Forgotten,* 41 U. Fla. L. Rev. 215, 223-27 (1989); Hutchins & Slesinger, *Some Observations on the Law of Evidence,* 28 Colum. L. Rev. 432, 437 (1928).

Although risks of misstatement and misperception are undeniable, they have not been thought serious enough to discard the exception:

> "One reason would seem to be that the exciting occasion is likely to focus the attention of the declarant upon the matter in question, and intense concentration is a countervailing force which tends at least to limit or confine the risk of misperception. And other reasons appear in the cases from time to time, although they are not framed as requirements of the exception and are seldom mentioned as part of its rationale. They include the following factors: Often the startling occurrence is itself at the heart of a litigated dispute, and often it is so fleeting that the need of the trier of fact is for more rather than less information in order to make an informed determination of exactly what happened; particularly in light of the nature of startling occurrences, the fresh statement of the observer is likely to be at least as reliable as his later reconstruction of events; finally, the startling occurrence is often an accident or violent crime which ultimately claims the life of the declarant and which he was better able to observe than any available witness, which means that excluding his statement would often result in doing without the best available evidence, and in the unattractive consequence of ignoring the cries of the victim." (4 D. Louisell & C. Mueller, Federal Evidence §439, at 493-94 (1980).)

Indeed, while conceding the dangers inherent in spontaneous declarations, McCormick concluded "that contemporaneous statements both excited and unexcited are so valuable for the accurate reconstruction of the facts that the need is not to narrow the use of excited statements but to widen the exception to embrace as well unexcited declarations of observers near the time of the happen-

ing." (C. McCormick, Evidence §272, at 579 (1954).) Federal rules of evidence also reflect a loosening of traditional evidentiary restrictions in order to obtain material evidence. (See Fed. R. Evid. 804(b)(5).) Perhaps in the information age a trier of fact *can* be trusted to evaluate relevant information while taking into consideration possible infirmities.

The observations of Louisell, Mueller and McCormick are, of course, especially apt here. We are confronted in this case with a dearth of evidence. However, Brooks' statement to Blomstrand, in which she described her assailants, is nonetheless inadmissible under Illinois law unless the evidence shows the statement was spontaneous, unreflecting and made within a time frame and under conditions which would foreclose an opportunity to fabricate. We believe Brooks' statement qualifies for admission as a spontaneous declaration, notwithstanding defense counsel's inept investigation of the case and handling of the foundation.

Approximately 2½ hours before she described her assailants, Brooks had witnessed the murders of her sister and another young woman, she had been set ablaze and sustained severe burns over approximately 40% of her body. During emergency medical treatment following her initial ordeal, clothing and skin were "cut" away from her body. Deep facial tissue was exposed. Even though the only testimony as to her condition at the time of her hospital statement was Blomstrand's testimony that she appeared to be in pain, and even though he further testified she was alert and responsive, we believe it is inconceivable that Brooks spent the intervening time attempting to reconstruct the details of her horrible experience, or fabricating a story to tell police. The very nature of her injuries was such that the injuries undoubtedly commanded her full attention.

Little more in the way of a foundation was laid for the identification admitted in *Gacho,* 122 Ill. 2d 221; nonetheless, this court held the declarant's statement qualified as a spontaneous declaration. In *Gacho,* the declarant, Infelise, was confined for 6½ hours in a car trunk with a dead man on a cold December night, all the while suffering from multiple gunshot wounds and resultant blood loss. When the trunk was opened by police and paramedics, Infelise was asked, "Who did this to you?" Although Infelise appeared to be in pain and was having difficulty breathing, he gave an officer a name which the officer perceived as "Robert Gott or Gotch." This court held the identification admissible, stating:

> "This undoubtedly horrifying experience would produce an unreflected statement. *** We believe it is inconceivable, as the trial court ruled, that Infelise would have spent the time under these conditions to attempt to fabricate a story or statement about the event." *Gacho,* 122 Ill. 2d at 241.

Infelise had sustained very serious injuries, appeared to be in pain, and was having difficulty breathing. Similarly, Brooks had sustained very serious injuries, appeared to be in pain and, because she was having difficulty breathing, wore an oxygen mask over her face at the time of questioning. Neither Infelise nor Brooks had a motive to fabricate. Quite the contrary, both would have had every reason to see their assailants brought to justice. Thus, lack of motive to fabricate, a factor which this court recently utilized in determining admissibility (*Nevitt,* 135 Ill. 2d at 445), would seem to favor admission of the statement in this case. The fact that Blomstrand said Brooks was "alert" and "responsive" does not require exclusion because those states do not foreclose the possibility of a spontaneous and unreflecting statement. In fact, to be "oblivious" and "unresponsive" is to be, essentially, comatose. We conclude that testi-

mony concerning the nature of the event, the physical condition of Brooks, and the absence of any conceivable motive to fabricate (see *Nevitt*, 135 Ill. 2d at 444-45) provide an adequate foundation for admission of her statement to Blomstrand wherein she gave a description of the assailants. The court erred when it excluded the statement.

We reject out of hand any contention that a declarant cannot make a spontaneous declaration to a person after having spoken previously to another. To the extent that language in *Gacho* and *People v. Jones* (1985), 105 Ill. 2d 342, 354, may support such an argument, we clarify our position here. No such *per se* rule exists. The folly of such a rule can be demonstrated by use of the following hypothetical. A person is involved in a collision and is seriously injured. Within minutes, two paramedics arrive. The injured party makes statements to each of them. The statements are only seconds apart. The *per se* rule which the State has extrapolated from *Gacho* and *Jones* would exclude the second statement even though the injured party's physical and mental condition is unchanged. The fact that the declarant may have previously spoken to another is merely a factor to consider in determining admissibility.

Although we have held the foundation adequate to support admission of Brooks' statement, had this not been the case we would have been compelled to reverse and remand this cause in any event, due to counsel's ineffective performance with respect to this facet of the case, and because of another erroneous evidentiary ruling which we will treat hereafter.

From our perspective, counsel's preparation of his case with respect to gaining admission of Brooks' hospital statement was deficient. Counsel first took the position that he had been "under the impression" that the State would stipulate to all medical reports, a matter

which the State vehemently denied. Other than one report in which Brooks purportedly expressed concern that her assailants would come after her in the hospital, counsel failed to point to any medical reports which would have aided him in laying a foundation for Brooks' condition. Counsel next called Dr. Kagan to testify; however, Kagan testified he had had no personal contact with Brooks on the evening of January 12. Although counsel knew notes were sometimes preserved, only after trial did counsel claim the State had failed to disclose nurses' notes which counsel claimed would have led to witnesses who could have supplied the necessary testimonial foundation for admission of Brooks' descriptions. Counsel should have known that Brooks might have been attended in the hospital by nurses who might actually have had knowledge of her physical and mental condition.

With respect to the discovery issue, defendant must establish that he requested the evidence in question, and that the State in fact possessed it and failed to disclose it. (*People v. Guest* (1986), 115 Ill. 2d 72, 91.) This, defendant has not done. Defendant concedes that the State was unaware nurses' notes existed prior to or during trial. The State disclosed what it had been provided by the hospital. Dr. Kagan informed defense counsel that nurses' notes often ended up in the wastebasket. Although the State's Attorney's office apparently represents Cook County Hospital in civil litigation, since this is not a civil case, we do not believe possession and control of this information must be imputed to the State's Attorney's office. The State's Attorney's office does not represent Cook County Hospital in *this* case and the personnel of the hospital are not the State's Attorney's "investigative personnel" within the meaning of our Rule 412(f) (107 Ill. 2d R. 412(f)). The State was not under a duty to discover and disclose the nurses' notes.

In any event, as we have indicated, defense counsel should have known nurses attended Brooks on January 12 and sought to use their testimony to establish his foundation when recourse to doctors proved unavailing. It appears a strong foundation could have been supplied through the testimony of nurse Joan Jones. Jones' affidavit, which counsel appended to his motion for a new trial, clearly established what common sense otherwise dictated: due to her severe and extensive burns, Brooks was "nervous, upset, excited, distraught, restless, anxious and apprehensive" during the evening of January 12. Her condition, as one would suspect, was her paramount concern. She did not spend this time fabricating descriptions to give the police. Defendant, however, never received the benefit of Jones' knowledge of Brooks' condition because the circuit court found defense counsel had not been diligent in securing Jones' information.

In this respect, counsel provided defendant ineffective assistance. Having found counsel's performance was deficient, we must now consider whether his deficiency prejudiced the defendant.

In order to demonstrate prejudice, "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068; *People v. Albanese* (1984), 104 Ill. 2d 504, 526 (adopting the *Strickland* standard).) When we consider testimony which defendant successfully presented (Grigsby's testimony and that of alibi witnesses), together with Brooks' generally exculpatory hospital statement describing her assailants, which in our view should have been considered, and would have, but for counsel's

deficiency, and other exculpatory evidence (Buchanon's testimony concerning Bodine's and Hill's admissions and actions) which, as we will discuss hereafter, may have been improperly excluded, our confidence in the outcome here is indeed undermined.

Considered cumulatively, this testimony (1) puts defendant at the game room on Lawndale at the time the offenses were committed, (2) puts Bodine at the apartment shortly before the offenses, (3) has Kim Brooks describing one offender who could not have been defendant and another whose description was perhaps consistent with defendant's, other than age, but who was referred to as "Bo," and (4) has Bodine and Charlie Hill making post-offense statements and taking actions which indicated they, not defendant, committed the crimes. Here, the only substantial evidence against defendant was his alleged oral confession which he immediately repudiated. This is not to say there was not evidence sufficient to establish defendant's guilt beyond a reasonable doubt—there was. However, the result may well have been different had the excluded evidence been admitted and had the trier of fact found it credible.

Before we conclude, we will briefly address the court's rulings concerning Sterling Buchanon's testimony. When the circuit court held Buchanon's testimony inadmissible, it ruled that (1) the statements were made too long after the event; (2) the statements were ambiguous, containing no clear admissions; (3) there was insufficient independent evidence to corroborate the statements; and (4) Bodine was dead and thus unavailable to testify, but Charlie Hill was available. Thus, testimony concerning Bodine's and Hill's alleged extrajudicial declarations was not considered as substantive evidence by the trier of fact.

An extrajudicial declaration not under oath, by the declarant, that he, and not the defendant, committed the

crime is inadmissible as hearsay, even though the declaration is against the declarant's penal interest. (*People v. Bowel* (1986), 111 Ill. 2d 58, 66.) However, such declarations may be admitted where justice requires. (*People v. Lettrich* (1952), 413 Ill. 172, 178.) Where there are sufficient indicia of trustworthiness of such extrajudicial statements, said declarations may be admissible under the statement-against-penal-interest exception to the hearsay rule. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313, 93 S. Ct. 1038, 1049; *Bowel*, 111 Ill. 2d at 66; *People v. Tate* (1981), 87 Ill. 2d 134, 143-44.) In *Chambers*, the Court expounded four indicia of trustworthiness: (1) the statement is made spontaneously to a close acquaintance shortly after the crime occurs; (2) the statement is corroborated by other evidence; (3) the statement is self-incriminating and against the declarant's interest; and (4) there is adequate opportunity for cross-examination of the declarant. *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49.

Although there is most assuredly a problem with the fourth factor since Bodine was dead and Hill could not be located, the presence of all four factors is not a condition of admissibility. They are indicia, not hard and fast requirements. (*Bowel*, 111 Ill. 2d at 67.) However, the circuit court in this case denied admission, stating, "The four elements must come together." Because the court appears to have applied the incorrect standard, and because, given the facts of this case, we cannot consider this error harmless, the question of admissibility should be reconsidered upon retrial. Here, as in *Lettrich*, 413 Ill. at 179, the State is relying solely upon a repudiated confession, which was allegedly obtained by physical duress, and which diverges from known facts in certain respects.

Moreover, there is no question the court erred when it failed to consider as substantive evidence Buchanon's testimony concerning Bodine's *actions* as opposed to his *statements*. Buchanon's testimony concerning Bodine's disposal of a sweater which smelled of fumes should have been considered, as it was unobjectionable on grounds of hearsay.

Although we remand this cause for a new trial, there is undoubtedly sufficient evidence to prove defendant guilty beyond a reasonable doubt should the trier of fact choose to believe the State's witnesses. Defendant's alleged oral confession amply demonstrates his guilt. However, our concern here is that defendant receive the benefit of a competent attorney who will ably represent him and at least see to it that evidence favorable to defendant, which is capable of admission, will be admitted and thus considered by the trier of fact.

For the reasons stated, the judgment of the circuit court of Cook County is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

JUSTICE MILLER, dissenting:

I do not agree with the court's conclusion that certain statements made by a victim in this case were admissible under the excited utterance exception to the hearsay rule. Accordingly, I dissent.

One of the victims, Kim Brooks, spoke with a police officer at the crime scene around 6:15 p.m., shortly after the discovery of the fire. In her conversation with the officer, Brooks recounted the details of the offenses, but she said that she did not know the identities of the offenders, and she did not describe them to the officer. On two occasions later that evening, Brooks spoke at the hospital with another police officer. The first conversation occurred around 8:30, and the second around mid-

night. On those occasions, Brooks provided descriptions of the two offenders.

At trial, defense counsel contended that neither description given by Brooks matched the defendant, and counsel sought to introduce, as substantive evidence, the second officer's testimony concerning Brooks's statements. The judge refused to admit the evidence, concluding that the statements did not meet the requirements of the excited utterance exception to the hearsay rule.

Admission of a hearsay statement as an excited utterance requires that three criteria be met: "(1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence." (*People v. Poland* (1961), 22 Ill. 2d 175, 181.) The present dispute centers on the length of time that elapsed between the occurrence and the declarant's statements. Discussing the second criterion for admission, this court has observed that "[t]he time factor is an elusive element and will vary with the facts of the case." (*People v. Shum* (1987), 117 Ill. 2d 317, 343.) "The proper question is whether the statement was made while the excitement of the event predominated." M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.3, at 627 (5th ed. 1990).

The circumstances of the present case demonstrate that the trial judge did not abuse his discretion in refusing to admit the proffered testimony as substantive evidence under the excited utterance exception to the hearsay rule. The two later statements that the defendant sought to introduce were made some 2½ and 6 hours after the event, and after the declarant's initial statement at the scene. During that time the declarant underwent medical treatment, and she was exposed to a variety of persons, including her brother. Unlike cases in which this court has found that delays between the event and the

statement did not prevent application of the spontaneous utterance exception (see, *e.g.*, *People v. Nevitt* (1990), 135 Ill. 2d 423; *People v. Gacho* (1988), 122 Ill. 2d 221), the present appeal involves a declarant who had already given one statement at the crime scene and who, following her rescue, provided additional information in response to subsequent questioning. Under the circumstances shown here, admission of the later statements would not be consistent with the hearsay exception asserted by the defendant. See *People v. Jones* (1985), 105 Ill. 2d 342.

In support of its decision in the present appeal, the majority poses a case in which a declarant, in response to a startling event, makes a remark to one person and immediately afterwards makes a remark to another person. The majority believes that both statements should be admissible, and cites that hypothetical to show that a declarant's successive statements should not necessarily fail to qualify as excited utterances. 141 Ill. 2d at 386.

Whatever may be said of the example posited by the majority, the circumstances of the present case are different. Here, the declarant initially made a statement to an officer at the scene. Not until several hours later, when the declarant was again questioned about the event, did she provide the information that the defendant attempted to introduce into evidence at trial. As noted, during that period the declarant received medical treatment, and she was exposed to a number of different persons between the times of her initial and subsequent statements. These circumstances indicate that the declarant's two later statements were not made "while the excitement of the event predominated." I would conclude that the trial judge did not abuse his discretion in excluding from evidence the hearsay testimony that the defense sought to introduce.