2020 IL App (1st) 172501-U

No. 1-17-2501

Order filed April 16, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 15 CR 6569 |
| | ) | |
| TYKARI BLACKMON, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for attempted first-degree murder where: (1) the State presented sufficient evidence to show he did not act in self-defense; (2) the trial court properly found that he failed to lay a sufficient foundation for the admission of a statement as an excited utterance; (3) his defense counsel was not ineffective; and (4) the trial court did not commit plain error by failing to include a necessary phrase in one of the jury instructions when it was included in the issues instruction.

¶ 2 Following a jury trial, defendant Tykari Blackmon was found guilty of attempted first-degree murder and sentenced to 25 years' imprisonment. On appeal, defendant contends that: (1) the State failed to present sufficient evidence to prove he did not act in self-defense; (2) the trial court erred in finding that he failed to lay a sufficient foundation for the admission of a statement he made as an excited utterance; (3) his defense counsel was ineffective while cross-examining one of the State's witnesses; and (4) the trial court committed plain error by omitting a necessary phrase in a jury instruction that defined the offense of attempted first-degree murder.

¶ 3                              I. BACKGROUND

¶ 4 The State charged defendant by information with five counts of attempted first-degree murder and one count of aggravated battery, all in connection with defendant's shooting of Rickey Hawthorne in August 2014. The State ultimately would proceed to trial against defendant on only one count of attempted first-degree murder. In defendant's answer to discovery, he indicated that he would assert self-defense.

¶ 5                            A. Pretrial Issues

¶ 6 Prior to trial, the State filed a motion *in limine* seeking, in part, to prevent defendant from introducing any statements he had made to witnesses because such statements would constitute inadmissible hearsay. The trial court granted the motion without an objection from the defense. The following day, before the parties' opening statements, defense counsel revisited the motion *in limine* and noted that defendant would be asserting self-defense at trial and thus, his state of mind was critical. Counsel highlighted that a witness, Gary Gladney, provided a written statement after the shooting.[1] In that statement, Gary told the police that, after defendant shot Hawthorne, Gary

_____

[1] Gary Gladney will be referred to by his first name, as his brother, Marvell Gladney, also was a witness.

asked defendant "you just going to shoot that man in front of me?" In response, defendant said "I thought he had a gun." Gary replied, "no, you did not." Counsel posited that defendant's statement showed his state of mind and why he reasonably believed he needed to shoot Hawthorne. Counsel also argued that defendant's statement was an excited utterance made "in the heat of the matter while he's fearful." The State contended that defendant's statement was not an excited utterance, but rather a response to Gary's question, and maintained that the statement was inadmissible hearsay. The trial court stated it could not "rule in a vacuum" and reserved ruling on the evidentiary issue until during trial, once more information had come to light about the circumstances of the statement. Defense counsel then noted that Hawthorne also mentioned defendant's statement in his own statement to the police. Still, the court wanted to reserve ruling on the issue and instructed counsel to request a sidebar before he cross-examined any witness on the statement.

¶ 7                                    B. Trial

¶ 8                              1. State's Case

¶ 9       Rickey Hawthorne, who acknowledged being convicted of robbery in 2013 and sentenced to nine months' imprisonment, testified that he was friends with defendant in 2014 and saw him almost every day. They were also neighbors, as defendant lived across the street and two houses down from Hawthorne on the 5300 block of South Laflin Street in Chicago. But their relationship deteriorated. Around August 20, 2014, Hawthorne found "inappropriate" text messages between his wife and defendant, which led Hawthorne to believe that they were having an extramarital affair. On either August 20 or 21, 2014, Hawthorne could not remember the exact day, he called defendant over to his house to confront him about the alleged affair and put an end to it. They met on Hawthorne's porch, and Hawthorne immediately punched defendant. After being hit, defendant tried to run away, but Hawthorne jumped on top of him and both fell to the ground. Before the

fight could continue, someone broke it up. After the fight, defendant went back to this house and Hawthorne did the same. At that point, according to Hawthorne, he had let "it all go" and "wasn't bothered" by the alleged affair anymore. Hawthorne explained at trial that "I still felt it in my heart, but I wasn't looking to do nothing to him."

¶ 10    On August 22, 2014, around 3 p.m., Hawthorne returned home from work and noticed defendant standing on his porch. Hawthorne then went to the front of his house, where his friend had parked his vehicle, and began helping his friend with the brakes of the vehicle. Around the vehicle, Hawthorne had various tools and he was wearing mechanic's gloves. Hawthorne, however, had to wait for a part to be delivered before finishing the brakes, so he remained outside by the vehicle. Around 4 p.m., Hawthorne again observed defendant standing on his front porch. Defendant then left the porch and began walking toward Hawthorne's house, but remained on the other side of the street. Defendant passed Hawthorne's house, but neither of them said a word. Defendant walked back toward his house and began talking to two men on his front porch. All three had hoodies on, and because it was a warm summer day, Hawthorne became "on edge" and kept an eye on them.

¶ 11    Soon thereafter, the three men began walking toward Hawthorne's house, still on the opposite side of the street. Defendant was walking slowly, almost "prancing." After defendant passed Hawthorne's house, Hawthorne, who had been kneeling, stood up, looked at defendant and asked him why he kept walking past his house. As Hawthorne said this, he was part way into the street, but not past the middle of the street. Defendant, still wearing his hoodie and with both hands inside the pocket of the hoodie, responded back saying he was "going to do something." Defendant walked to the edge of the curb and pulled out a firearm. Hawthorne took a step toward defendant, but was still not past the middle of the street, and said "you want to fight again?" Defendant then

fired his weapon. Hawthorne believed that defendant fired six shots at him and several shots hit him, which caused him to fall to the ground. While on the ground, Hawthorne heard "a couple clicks" of defendant's firearm.

¶ 12    At trial, Hawthorne denied having anything in his hands when he was shot and denied raising his shirt at all during the confrontation. Hawthorne acknowledged that he "probably didn't" tell the police that defendant had walked back and forth in front of his house before the shooting and "probably didn't" tell them that defendant was wearing a black hoodie. Hawthorne also could not recall telling the police about the two additional men in black hoodies.

¶ 13    Brothers Gary and Marvell Gladney were on the 5300 block of South Laflin Street when the shooting occurred. Gary lived on the block at his grandmother's house and knew both defendant and Hawthorne well, in particular defendant, who Gary had known for some 20 years. Marvell, who was visiting Gary, also had known defendant for over 20 years. In the afternoon of the shooting, Gary and Marvell were sitting on lawn chairs on the sidewalk in front of their grandmother's house, which was two houses and a vacant lot away from Hawthorne's house, on the same side of the street. Gary, who was closer to Hawthorne's house than Marvell, had an unobstructed view of Hawthorne working on the vehicle from a distance of what he estimated to be about 10 to 12 feet. Marvell's view toward Hawthorne was obstructed by a tree.

¶ 14    While sitting on the lawn chair, Gary observed defendant on his front porch with two other men. Later, Gary observed defendant exit his own house alone and walk toward West 54th Street, which was in the same direction as Hawthorne's house. Defendant stopped right across from Hawthorne's house, prompting Hawthorne to take four or five steps into the street and stop right in the middle of the street. Hawthorne asked defendant "where you think you going?" and took a step or two toward defendant. Defendant did not respond, pulled out a firearm and "started straight

up shooting." Gary thought he heard six shots and then two or three "clicks" from the firearm afterward. Hawthorne fell to the ground, and defendant walked quickly back to his house. Gary subsequently called the police. At trial, Gary testified that he never observed anything in Hawthorne's hands, never saw Hawthorne lunge or swing at defendant, did not see Hawthorne lift his shirt, and did not hear Hawthorne make any kind of threats toward defendant.

¶ 15    Marvell had also observed defendant with two other people on his front porch, but testified that he never saw him leave the porch. At trial, Marvell acknowledged that, in his statement to the police and an assistant state's attorney, he stated that he "saw [defendant] come off the porch and walk toward[] 54th Street." But Marvell testified that he did not remember saying that. Later, while Marvell was sitting in the lawn chair, he heard about six gunshots but could not see the shooter because of the tree obstructing his view. Marvell did not hear anything after the gunshots. After the shooting was over, Marvell observed defendant walking "normally" down the street with a firearm in his hand.

¶ 16    The police and paramedics arrived on the scene, including evidence technician Kamal Judeh, who did not collect any weapons from the scene. Chicago Police Sergeant Steven Barsch arrived 5-10 minutes after the shooting and immediately observed Hawthorne bleeding on the ground. Hawthorne was conscious and able to speak, so Sergeant Barsch asked him what happened, and Hawthorne pointed at a house down the block. Because of Sergeant Barsch's familiarity with the neighborhood, he knew defendant resided there. Sergeant Barsch knocked on the door of defendant's house and looked for him in the area of the shooting, but could not find him. Additionally, Chicago Police Detective Chad Behrend arrived at the scene and unsuccessfully searched for defendant, including in his house.

¶ 17    Keith Garr, a paramedic with the Chicago Fire Department, arrived at the scene and aided Hawthorne. Although Garr did not know how many times Hawthorne had been shot, he counted four "holes," including one in Hawthorne's right arm as well as upper thigh near his femoral artery. Though Hawthorne had been shot, Garr observed that he was conscious and fully alert. Garr helped transport Hawthorne to the hospital, where Hawthorne was diagnosed with various injuries, including multiple fractures in his left leg. Hawthorne underwent surgery on his left leg and rods had to be inserted to hold the leg together. Due to his injuries, Hawthorne remained in the hospital for about 11 days. At the hospital, Hawthorne gave a statement to the police about what happened, but at trial, he said he could not really remember what he told the police except that he identified defendant as the shooter.

¶ 18    Detective Behrend continued to investigate the shooting and spoke to Gary, who identified defendant in a photo array as the shooter. Detective Behrend eventually obtained an arrest warrant for defendant. In March 2015, the police found defendant in a small town outside of St. Paul, Minnesota. Detective Behrend and a partner went to Minnesota, escorted defendant back to Chicago and placed him under formal arrest.

¶ 19                                    2. Defense Case

¶ 20    In the defense's case, Detective Behrend testified that, after the shooting, both Gary and Marvell told him that Hawthorne and defendant had an argument before the shooting occurred. Detective Behrend characterized their remarks as saying, in essence, "[w]ords were exchanged."

¶ 21    Chicago Police Detective Anthony Galviano testified that he interviewed Hawthorne at the hospital shortly after the shooting. Although Detective Galviano observed Hawthorne was in pain, Hawthorne was able to have a conversation with him about the shooting. According to Detective

Galviano, Hawthorne never stated that defendant was wearing a black hoodie and never stated that defendant walked up and down the block before the shooting.

¶ 22    Defendant also testified, acknowledging that he had a sexual relationship with Hawthorne's wife that began when Hawthorne was incarcerated for robbery and continued after Hawthorne was released. Defendant and Hawthorne's wife would express affection for one another in text messages. On August 19, 2014, defendant received a phone call, asking him to go to Hawthorne's house. Defendant went there and observed a crowd of people in front of the house. After defendant arrived, Hawthorne came out of the house, walked off the porch and began punching him. Defendant did not fight back, and Hawthorne jumped on top of him and continued "beating" him. Defendant was able to become loose and tried to run away, but Hawthorne caught him and continued "beating" him. Eventually, someone broke up the fight. Hawthorne told defendant that, if he found out defendant was having a sexual relationship with his wife, he would "kill" defendant. Afterward, defendant went back to his house, where he was "shocked," "scared" and "nervous." Defendant, however, acknowledged never calling the police or going to a hospital following the fight. Over the next couple days, defendant saw Hawthorne three times, and each time, Hawthorne was "[t]hreatening" toward him, though defendant still did not contact the police.

¶ 23    On August 22, 2014, at some unknown time, defendant claimed he saw Hawthorne with a firearm. Later that day, in the afternoon, defendant was on his porch with his neighbor and his neighbor's friend. The neighbor and his friend left the porch, and defendant, who was armed with a firearm at the time, left his house to go to a nearby restaurant, which required him to walk past Hawthorne's house. Defendant armed himself with the firearm because Hawthorne had "threatened" him multiple times, including once saying he was going to shoot defendant, though defendant acknowledged that he did not have a license to carry the firearm. While defendant could

have taken an alley to avoid passing by Hawthorne's house, defendant testified that it was "[n]ot a good idea to walk through the alley." Defendant also did not want to take a longer route while carrying a firearm, explaining this, too, was not a good idea. As he walked past Hawthorne's house, Hawthorne was outside, and although defendant tried to "mind [his] business," Hawthorne noticed him and said "you think I'm playing with your b*** ass?" Hawthorne then walked toward defendant while reaching in his pocket, which revealed the butt of a firearm and caused defendant to stop walking. Defendant thought Hawthorne "was going to kill" him, and so he took out his own firearm and shot it at Hawthorne.

¶ 24    After the shooting, defendant did not remain on the scene to talk to the police because he thought they would not believe him. According to defendant, the police detained him not far from the scene of the shooting but did not ask him any questions, so he did not tell them that he shot Hawthorne. Defendant then left Chicago and went to Minnesota. He was later taken into custody by Chicago police and asked questions about the shooting of Hawthorne. Defendant admitted telling the police that he did not know Hawthorne, Gary or Marvell, that he was homeless all of 2014, and that he did not live on the 5300 block of South Laflin Street, all of which he conceded were lies. Defendant further admitted not telling the police that Hawthorne had a gun or how scared he was of Hawthorne before the shooting. Defendant claimed he did not tell the police the truth because he was "scared" they would not believe him.

¶ 25    Following defendant's testimony, defense counsel entered into evidence a certified copy of Hawthorne's prior robbery conviction.

¶ 26                              3. Excited Utterance Testimony

¶ 27    Consistent with the trial court's pretrial ruling on the introduction of defendant's statement that he thought Hawthorne had a firearm, defense counsel requested a sidebar before cross-

examining Hawthorne. During the sidebar, counsel attempted to provide a foundation for the admission of the statement through Hawthorne, at this juncture arguing that "it [was] not being offered for its truth, and if it [was] hearsay, it's an exception under excited utterance."

¶ 28    During defense counsel's questioning of Hawthorne, he stated that, immediately after he was shot and fell to the ground, he heard someone say "I can't believe you did that." When asked by defense counsel if defendant responded "I thought he had a gun," Hawthorne denied hearing such an assertion. However, when counsel presented Hawthorne with his written statement to the police, he acknowledged telling them that defendant said it. After acknowledging the statement, Hawthorne testified that defendant's voice was "[c]alm" when he said it. Hawthorne reiterated that he did not have a firearm on him the day defendant shot him.

¶ 29    Defense counsel argued that defendant's statement was spontaneous, uttered within seconds of him firing his gun and with "no time to fabricate." Counsel added that believing someone was armed with a firearm would cause someone to be "stressed and excited." The State, meanwhile, argued that defendant's statement was not spontaneous and not an excited utterance because the statement was self-serving and prompted by someone else. The trial court concluded that defense counsel had failed to present a sufficient foundation for the admission of defendant's statement. The court observed that, just because a gunshot had precipitated the statement, did not "necessarily mean" it was a "startling occurrence," as the statement could still be "a premeditated event." The court accordingly precluded defendant from introducing the statement. Defense counsel subsequently asked the court if she could introduce the statement through defendant himself if a sufficient foundation were laid through his testimony. The court responded that, "[i]f proper foundation is laid for an excited utterance *** it will be admitted." But the court reiterated

that defendant's statement could not be introduced through Hawthorne as an excited utterance. The court also concluded that the statement was not admissible under any other basis.

¶ 30 Later during the trial, outside the presence of the jury and immediately before the State rested its case, defense counsel confirmed to the trial court that she had not wanted an additional foundational hearing to introduce defendant's statement through Gary. However, during the defense's case before defendant testified and outside the presence of the jury, defense counsel indicated that she wanted to introduce defendant's statement through defendant himself. The State argued that it was improper for the defense to lay the foundation for defendant's own statement through himself and argued "[t]here is nothing that they can lay a foundation for that would allow for the defendant to give his statement he said on that day." The trial court agreed with the State, remarking that "it's a prior consistent statement coming through him." The court noted that the statement could have been admissible if the proper foundation been laid through Hawthorne or Gary, but the court was adamant that the statement could not be admissible "as an excited utterance through the defendant's testimony." Defense counsel informed the court she understood and noted for the record that the court's ruling was over the defense's objection. Following defendant's trial testimony, defense counsel made an offer of proof regarding defendant's statement. Counsel stated that defendant would have testified that, after he shot Hawthorne, while still under the stress and excitement of the event and being scared, he stated that he thought Hawthorne had a gun. Counsel noted that the statement was made openly in the presence of other people.

¶ 31                                    4. Jury Instructions

¶ 32 The trial court provided the jury with various instructions, including People's Instruction No. 15, which informed the jury of the definition of attempted first-degree murder. The instruction stated: "A person commits the offense of attempt first degree murder when he with the intent to

kill an individual, does any act which constitutes a substantial step toward the killing of an individual. The killing need not have been accomplished." The instruction was based on Illinois Pattern Jury Instruction, Criminal, No. 6.05X (4th ed. 2000) (hereinafter IPI Criminal 4th). The model instruction states: "A person commits the offense of attempt first degree murder when he, [without lawful justification and] with the intent to kill an individual, does any act which constitutes a substantial step toward the killing of an individual." *Id.* The Committee Note states that the phrase " 'without lawful justification' " should be used whenever the defendant raises self-defense, as defined in section 7-1 of the Criminal Code of 2012 (720 ILCS 5/7-1 (West 2014)).

¶ 33                                    5. Verdict, Posttrial and Sentencing

¶ 34    Following the parties' arguments, the jury found defendant guilty of attempted first-degree murder. Defendant filed a motion for a new trial, raising several contentions of error, including that the trial court erred in precluding him from introducing his statement that he thought Hawthorne had a gun under the hearsay exception for excited utterances. Defendant also argued that the court erred in providing the jury with People's Instruction No. 15 because the instruction failed to include language indicating that he had raised self-defense. In addition, defendant argued that the jury was not properly instructed on sentencing enhancements for personally discharging a firearm and proximately causing great bodily harm. Although the court granted defendant's motion with respect to the issue of the sentencing enhancements and struck the possibility of him receiving an extended-term sentence, it rejected defendant's additional contentions of error. The court subsequently sentenced him to 25 years' imprisonment.

¶ 35    This appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37                                    A. Evidence of Self-Defense

¶ 38    Defendant first contends that the evidence overwhelmingly showed that he acted in self-defense when he shot Hawthorne. Defendant argues that, because Hawthorne had attacked him mere days before the shooting and confronted him on the street right before the shooting, he reasonably feared for his life and was justified in shooting Hawthorne to defend himself.

¶ 39    When a defendant challenges the sufficiency of the evidence, the reviewing court must determine if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. All reasonable inferences from the evidence must be made in the State's favor. *People v. Hardman*, 2017 IL 121453, ¶ 37. Under this standard of review, it is not the reviewing court's role to retry the defendant. *Gray*, 2017 IL 120958, ¶ 35. And the reviewing court will not substitute its judgment for that of the trier of fact on issues involving the credibility of witnesses, the weight to be afforded to the trial evidence, the drawing of reasonable inferences from the evidence and the resolution of conflicts within the evidence. *Id.* We will not reverse a conviction "unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 40    To prove a defendant guilty of attempted first-degree murder, the State must prove that he performed an act that constituted a "substantial step" toward committing murder and he intended to kill his victim. 720 ILCS 5/8-4(a), 9-1(a) (West 2014); *People v. Vega*, 2018 IL App (1st) 160619, ¶ 41. The State must prove that the defendant had the specific intent to kill the victim. *Vega*, 2018 IL App (1st) 160619, ¶ 41. "However, because the specific intent to take a life is a state of mind, it is rarely proven through direct evidence." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. " '[T]he very fact of firing a gun at a person supports the conclusion that the

person doing so acted with an intent to kill.' " *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39 (quoting *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001)).

¶ 41    Self-defense is a lawful justification to attempted first-degree murder. 720 ILCS 5/7-1(a) (West 2014); see also *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995). Under Illinois law:

> "[A] person is justified in the use of force against another when and to the extent
> that he reasonably believes that such conduct is necessary to defend himself or
> another against such other's imminent use of unlawful force. However, he is
> justified in the use of force which is intended or likely to cause death or great bodily
> harm only if he reasonably believes that such force is necessary to prevent imminent
> death or great bodily harm to himself or another, or the commission of a forcible
> felony.

720 ILCS 5/7-1(a) (West 2014). As an affirmative defense, the defendant has the burden of raising self-defense unless the State's evidence raises the issue. *People v. Everette*, 141 Ill. 2d 147, 157 (1990). To raise self-defense, the defendant must present some evidence that: "(1) force [was] threatened against a person; (2) the person [was] not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." *Jeffries*, 164 Ill. 2d at 127-28. Once the defendant presents evidence of self-defense, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense, which it can do by negating any one of the elements of self-defense. *Id*. Whether an attempted murder is justified by self-defense is a question of fact to be resolved by the trier of fact. *People v. Felella*, 131 Ill. 2d 525, 533 (1989). The trier of fact is "not obligated to accept a defendant's claim

of self-defense" but rather must consider the claim based upon the circumstances. *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002).

¶ 42     In the present case, the resolution of whether defendant was justified in using self-defense essentially came down to credibility and whether the jury believed his shooting of Hawthorne was warranted under the circumstances. Both questions belonged to the jury to resolve. See *Gray*, 2017 IL 120958, ¶ 35; *Felella*, 131 Ill. 2d at 533. But regardless, the overwhelming evidence showed that Hawthorne was unarmed when he approached defendant, questioned his presence and asked if he wanted to fight again. "Where a defendant shoots an unarmed victim, who was not in a position to cause great bodily harm, a fact finder may rationally conclude that any belief of imminent danger so as to justify the use of deadly force was unreasonable." *People v. Lewis*, 2012 IL App (1st) 102089, ¶ 17. It is true that this evidence could possibly be construed as Hawthorne being the initial aggressor, but "the question still remains whether defendant's resort to the force was reasonable under the circumstances, and whether the amount of force used by defendant was commensurate with the force encountered." *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 61. The jury thus had to consider this possibility along with all of the circumstances surrounding the encounter of August 22, 2014, including the past fight between Hawthorne and defendant, the alleged threats from Hawthorne to defendant after the fight and the alleged resulting fear in defendant. Even if the jury believed Hawthorne was the initial aggressor, there was overwhelming evidence that defendant's response was unjustified given Hawthorne being unarmed.

¶ 43     Although defendant claimed he thought Hawthorne was armed with a firearm and observed Hawthorne display the butt of a firearm, that testimony was refuted by Hawthorne's testimony, Gary's testimony and the fact that no weapons were recovered from the scene. The jury was free to disbelieve defendant in light of the various evidence contradicting his claim and his own self-

interest in claiming he thought Hawthorne was armed. See *People v. Almo*, 108 Ill. 2d 54, 67 (1985). Furthermore, while it is true that Hawthorne, by his own admission, instigated a physical altercation with defendant mere days before the shooting, "[t]he right of self-defense does not justify an act of retaliation or of revenge; it is a right intended to protect an individual and not an individual's pride." *Everette*, 141 Ill. 2d at 162. We do not know precisely why the jury rejected defendant's claim of self-defense and found him guilty of attempted first-degree murder, but the evidence from trial undoubtedly supported the jury's overall conclusion. A rational trier of fact therefore could have found that the State proved defendant did not act in self-defense.

¶ 44    Defendant, however, highlights *People v. Givens*, 26 Ill. 2d 371 (1962), and argues that a conviction, albeit one for murder, has been reversed in "lesser circumstances." In *Givens*, our supreme court reversed a defendant's conviction for first-degree murder, finding his claim of self-defense to be supported where the victim entered the defendant's dwelling. *Id.* at 373, 386. Defendant's reliance on *Givens* is misplaced for two reasons. First, the decision involved the defense of a dwelling, which is governed under different principles than the defense of a person. See 720 ILCS 5/7-1 (West 2014) (discussing the use of force in defense of person); 720 ILCS 5/7-2 (discussing the use of force in defense of dwelling). Second, in *Givens*, our supreme court did not utilize the standard of review now applicable in reviewing all criminal convictions. See *Gray*, 2017 IL 120958, ¶ 35 (remarking that, when a defendant challenges the sufficiency of the evidence, the reviewing court must determine if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt). That standard of review, utilized by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), was first applied by our supreme court in *People v. Collins*, 106 Ill. 2d 237, 261 (1985) and has been utilized ever since. See *People v. Murray*, 2019 IL

123289, ¶ 19; *People v. Nere*, 2018 IL 122566, ¶ 69; *Gray*, 2017 IL 120958, ¶ 35. The decision in *Givens* therefore does not support reversing defendant's conviction. Accordingly, there was sufficient evidence to convict defendant of attempted first-degree murder.

¶ 45                              B. Alleged Excited Utterance

¶ 46    Defendant next contends that the trial court improperly barred him from introducing into evidence his statement shortly after shooting Hawthorne where he explained he shot Hawthorne because he thought Hawthorne had a firearm. Defendant posits that he presented a sufficient foundation to show that he made the statement under the stress of the confrontation with Hawthorne.

¶ 47    Hearsay is an out-of-court statement offered to prove the truth of the matter asserted, and generally, it is inadmissible at trial as substantive evidence. Ill. R. Evid. 801 (eff. Oct. 15, 2015); 802 (eff. Jan. 1, 2011). It is generally inadmissible because hearsay often lacks the reliability to be considered a trustworthy source of evidence. *People v. Caffey*, 205 Ill. 2d 52, 88 (2001). However, certain exceptions to this general rule allow for hearsay to be admitted substantively at trial (*id*.), including when the hearsay statement was an excited utterance (Ill. R. Evid. 803(2) (eff. Sept 28, 2018); *People v. Smith*, 152 Ill. 2d 229, 258 (1992)), sometimes referred to as a spontaneous declaration. *People v. Sutton*, 233 Ill. 2d 89, 107 (2009). Under this exception, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is substantively admissible at trial. Ill. R. Evid. 803(2) (eff. Sept 28, 2018). Such statements are deemed reliable enough to be considered substantive evidence because when statements are made with spontaneity and the absence of time to fabricate, " 'the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him.' " *People v. Damen*, 28 Ill. 2d 464, 471 (1963) (quoting *Keefe v. State*, 50

Ariz. 293, 298 (1937)); see also *People v. Nevitt*, 135 Ill. 2d 423, 443 (1990) (observing that excited utterances "tend to be reliable").

¶ 48    To be admissible as an excited utterance, the proponent of the statement must demonstrate that: (1) an event or condition occurred that was "sufficiently startling to produce a spontaneous and unreflecting statement;" (2) there was a lack of time to fabricate the statement; and (3) the statement related to the circumstances of the occurrence. *People v. Lerma*, 2016 IL 118496, ¶ 5, n. 1. When viewing these three elements, we must consider the totality of the circumstances. *People v. Williams*, 193 Ill. 2d 306, 352 (2000). Such circumstances include the time between the event and statement, "the nature of the event, the mental and physical condition of the declarant, and the presence or absence of self-interest." *People v. House*, 141 Ill. 2d 323, 382 (1990). The court's determination of whether to admit a statement as an excited utterance "involves factfinding and assessing the credibility of witnesses." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 81. The trial court has broad discretion in making evidentiary rulings, and thus, we review its evidentiary rulings for an abuse of discretion, which occurs only where the ruling was arbitrary or unreasonable such that no reasonable person would adopt the same view. *Caffey*, 205 Ill. 2d at 89.

¶ 49    In the present case, defendant made the statement that he thought Hawthorne had a firearm after shooting Hawthorne and immediately after Gary asked him "you just going to shoot that man in front of me?" Initially, we note that defendant made the remark at nearly his first opportunity to speak after the shooting. See *People v. Gacho*, 122 Ill. 2d 221, 241 (1988) (observing that the declarant's making of a statement at his first opportunity to speak supports a finding of spontaneity). And merely because defendant made the remark in response to Gary's query about the shooting does not destroy the spontaneity of the statement. *Id.* at 242.

¶ 50    Additionally, under certain circumstances, shootings have been held to be sufficiently startling events for a subsequent statement to be admitted as an excited utterance. See *People v. Robinson*, 217 Ill. 2d 43, 62 (2005) (shooting victim's identification of the defendant minutes after he was shot was "sufficiently startling" to be admissible as an excited utterance); *Gacho*, 122 Ill. 2d at 241-42 (shooting victim's identification of the defendant some six hours after he was shot and confined in the trunk of a vehicle was a sufficiently "horrifying experience" to "produce an unreflected statement" to be admissible as an excited utterance). *People v. Sullivan*, 366 Ill. App. 3d 770, 781 (2006) (eyewitness's identification of the defendant as the shooter to another witness shortly after observing a shooting deemed sufficiently startling to be admitted as an excited utterance). Similarly, being threatened by a firearm may be sufficiently startling to produce a spontaneous and unreflecting statement. See *Simon*, 2011 IL App (1st) 091197, ¶ 82. But a firearm allegedly merely being displayed, but not directly pointed at another person, has been deemed "a less startling event." *Id.* That is to say, shootings and being threatened with a firearm can produce sufficiently startling events for excited utterances, but they do not automatically guarantee admission and the other elements of the test must be satisfied, such as the lack of time to fabricate the statement. See *Lerma*, 2016 IL 118496, ¶ 5, n. 1.

¶ 51    It is true that defendant made his statement seconds after shooting Hawthorne and seconds after Hawthorne allegedly threatened him with a firearm, but time is an "elusive" factor and its "significance will vary with the facts of each case." *House*, 141 Ill. 2d at 382. For example, "[i]f a man with a gun intended to kill someone, he could easily set up people to support a self-defense claim, which could be completed within minutes." *Simon*, 2011 IL App (1st) 091197, ¶ 82. Such was the concern of the trial court, who remarked that, given the facts of the case, defendant's statement could have been premeditated. In other words, the court expressed doubt that defendant

sincerely believed Hawthorne had a firearm. See *id.* ¶ 81 (observing that the trial court's determination of whether to admit a statement as an excited utterance "involves factfinding and assessing the credibility of witnesses"). Notably, defendant made a conscious decision to walk past Hawthorne's house while armed with a loaded firearm. There was undoubtedly a strong motivation for defendant to fabricate a statement that Hawthorne had a firearm before he shot Hawthorne, especially since defendant attempted to use that statement in support of his self-defense claim. See *House*, 141 Ill. 2d at 382 (observing that "the presence or absence of self-interest" is a factor to consider in determining whether an excited utterance is admissible). Under the totality of the circumstances, especially given the inherent, strong motivation for defendant to claim that Hawthorne had a firearm, we cannot say that the trial court's ruling that defendant failed to lay an adequate foundation to admit his statement was so arbitrary or unreasonable such that no reasonable person would adopt the same view.

¶ 52    Nevertheless, defendant highlights *People v. Leonard*, 83 Ill. 2d 411 (1980) and argues that the mere presence of a firearm and the fight over it was deemed sufficiently startling to make admissible the statement: "He's got a gun." In *Leonard*, a security guard of an apartment complex made that statement to the resident manager of the apartment complex over the phone in reference to the defendant just before the security guard and the defendant struggled over the firearm, which resulted in the security guard being shot and killed. *Id.* at 414-415. The trial court allowed the State to admit the statement into evidence as an excited utterance. *Id.* at 419. Yet, in the case, there was no evidence that the security guard had a motive to fabricate the statement about the presence of the firearm (*id.* at 418-19), which is plainly distinguishable from the facts of the instant case. *Leonard* therefore does not persuade us that the trial court erred.

¶ 53 Defendant further complains in one sentence about the trial court rejecting his attempt to introduce his statement through his own trial testimony. Yet defendant does not support this complaint with any legal authority. To the extent he is arguing that the court erred in this manner, he has forfeited this possible argument by not citing relevant legal authority. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" and "[p]oints not argued are forfeited"). Accordingly, the trial court did not abuse its discretion in precluding defendant from introducing his statement into evidence.

¶ 54                    C. Ineffective Assistance of Counsel

¶ 55 Defendant next contends that his defense counsel rendered ineffective assistance while cross-examining Marvell. During that cross-examination, defense counsel asked Marvell if he recalled telling the police and an assistant state's attorney that he "saw [defendant] walk toward[] Rickey Hawthorne?" and whether he recalled telling them that he "heard [Hawthorne] and [defendant] arguing?" Marvell denied remembering either statement. Later during the cross-examination, counsel produced that statement for Marvell and asked him to read it. Marvell read the statement, remarking: "[H]e then saw [defendant] come off the porch and walk toward[] 54th Street." Based on the discrepancy between the actual statement Marvell made (walking toward "54th Street") and how counsel initially characterized it (walking toward "Hawthorne" and hearing argument), defendant argues that his counsel's cross-examination of Marvell constituted ineffective assistance.

¶ 56 To establish that trial counsel was ineffective, the defendant must satisfy the standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. Under this standard, he must show that his counsel's performance was deficient and

the deficiency prejudiced him. *People v. Valdez*, 2016 IL 119860, ¶ 14. More specifically, the "defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Henderson*, 2013 IL 114040, ¶ 11. Both prongs of the *Strickland* test must be met, and thus, the failure to establish either prong precludes a finding of ineffective assistance of counsel. *Id.*

¶ 57    In this case, defendant claims generally that his defense counsel's cross-examination of Marvell "played right into the hands of the prosecution, and hurt the defense case" and further posits that "[t]here is no justification for undercutting one's own defense." In the heading to this argument, though nowhere in the body of the argument, defendant asserts that counsel caused the jury to be confused by presenting evidence that he was the aggressor, contrary to his trial theory. However, despite citing to *Strickland* as the "familiar standard" under which an attorney's performance is judged, defendant completely fails to argue specifically how defense counsel's cross-examination of Marvell fell below an objective standard of reasonableness let alone how counsel's allegedly deficient cross-examination prejudiced him. Because defendant has failed to present any argument on the critical elements of the *Strickland* test, he has forfeited his claim of ineffective assistance of counsel. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" and "[p]oints not argued are forfeited"); see also *People v. Macias*, 2015 IL App (1st) 132039, ¶ 88 (finding a defendant forfeited his ineffective assistance of counsel claim because he made a cursory argument and did "not cite any authority").

¶ 58                                    D. Jury Instruction

¶ 59 Defendant lastly contends that People's Instruction No. 15, which defined the offense of attempted first-degree murder, incorrectly stated the applicable law, and the trial court committed reversible error by allowing the inaccurate instruction to go to the jury.

¶ 60 Defendant concedes that he did not object to People's Instruction No. 15 during the jury instructions conference and only raised the issue in his posttrial motion, which generally results in the defendant forfeiting appellate review of the issue. *People v. Thompson*, 238 Ill. 2d 598, 611 (2010). However, defendant posits that, under Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013), "substantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." When a defendant invokes Rule 451(c), we utilize the plain-error doctrine to review the claim of error. *People v. Downs*, 2015 IL 117934, ¶ 14. Under the plain-error doctrine, we may review an unpreserved claim of error if there was a clear or obvious error, and either (1) the evidence was so closely balanced that the error, by itself, threated to tip the scales of justice against the defendant, regardless of the gravity of the error, or (2) the error was so serious that it resulted in an unfair trial to the defendant and challenged the integrity of the judicial process, regardless of how close the evidence was at trial. *People v. Sebby*, 2017 IL 119445, ¶ 48. The defendant has the burden to show plain error occurred (*Thompson*, 238 Ill. 2d at 613), and the first step under the doctrine is to determine whether there was a clear or obvious error. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 61 The purpose of jury instructions is to accurately convey to the jury the applicable principles of the law so that the jurors can analyze the evidence presented at trial under those legal principles to arrive at the proper conclusion based on the law and facts. *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 40. The Illinois Pattern Jury Instructions "have been painstakingly drafted," and trial courts "should not take it upon themselves to second-guess the drafting committee where the

instruction in question clearly applies." (Internal quotation marks omitted.) *People v. Durr*, 215 Ill. 2d 283, 301 (2005). To this end, Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013) requires that, when the jury should be instructed on a principle of law and an Illinois Pattern Jury Instruction exists on that principle, the Illinois Pattern Jury Instruction "shall be used, unless the court determines it does not accurately state the law." We review *de novo* whether a jury instruction accurately conveyed the law to the jury. *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 62    People's Instruction No. 15 stated: "A person commits the offense of attempt first degree murder when he with the intent to kill an individual, does any act which constitutes a substantial step toward the killing of an individual. The killing need not have been accomplished." This instruction was based on IPI Criminal 4th No. 6.05X. The model instruction states: "A person commits the offense of attempt first degree murder when he, [without lawful justification and] with the intent to kill an individual, does any act which constitutes a substantial step toward the killing of an individual." *Id.* The Committee Note to the model instruction states that the bracketed phrase " 'without lawful justification' " should be used whenever self-defense, as defined in section 7-1 of the Criminal Code of 2012 (720 ILCS 5/7-1 (West 2014)), has been raised. IPI Criminal 4th No. 6.05X, Committee Note.

¶ 63    We recognize that "[t]he comments of the supreme court's jury instruction committee are not law [citation] and the committee's recommendations and comments do not conclusively determine the propriety of the trial court's instructions." *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 63. Still, because the Committee Note to IPI Criminal 4th No. 6.05X instructs the trial court to include the "without lawful justification" language when a defendant raises self-defense, and defendant in this case raised self-defense, People's Instruction No. 15 should have included the self-defense language. As such, we find that it was a clear or obvious error. See *People v. Rios*,

318 Ill. App. 3d 354, 362 (2000) (finding the trial court "erroneously omitted" the " 'without lawful justification' language" from the definitional instruction of first-degree murder where the defendant raised self-defense). However, although the "without lawful justification" language was erroneously omitted from People's Instruction No. 15, defendant has failed to convince us the error was a plain error.

¶ 64    The first prong of the plain-error doctrine does not afford defendant relief, as the evidence was overwhelming that defendant shot Hawthorne without legal justification based on anger and resentment stemming from an earlier physical altercation between the two. Only defendant claimed that Hawthorne was armed and presented a threat that necessitated potentially deadly force. Meanwhile, Hawthorne testified he was unarmed, never lunged or swung at defendant, and never lifted his shirt up. Hawthorne's testimony was corroborated by Gary's testimony and further by the evidence that no weapons were recovered at the scene. Additionally, defendant fled the State after the shooting for approximately seven months, which shows a consciousness of guilt. See *People v. Moore*, 2015 IL App (1st) 140051, ¶ 26. The evidence against defendant in this case was not close, and the failure of the trial court to provide the jury with the applicable definition of attempted first-degree murder did not threaten to tip the scales of justice against him.

¶ 65    The second prong of the plain-error doctrine likewise affords defendant no relief. Under this prong, the defendant must demonstrate that the instructional error created a "*severe* threat to the fairness of [his] trial." (Emphasis in original.) *People v. Hopp*, 209 Ill. 2d 1, 12 (2004). We have no doubt that, despite the instructional error, defendant received a fair trial because the jury clearly understood that, in order to find him guilty of attempted first-degree murder, it had to find that the State proved beyond a reasonable doubt that he did not act in self-defense. Notably, in the jury's issues instruction for attempted first-degree murder, the instruction informed the jury that,

in order to find defendant guilty of the offense, it had to find that: (1) defendant performed an act which constituted a substantial step toward the killing of Hawthorne; (2) defendant did so with the intent to kill Hawthorne; (3) during the commission of the offense, defendant personally discharged a firearm that proximately caused great bodily harm to Hawthorne; and (4) defendant "*was not justified in using the force which he used*." (Emphasis added.) The issues instruction further informed the jury that it should find defendant guilty of the offense only if it found each of the four propositions proven beyond a reasonable doubt. "[T]his court has held that the omission of the justification language from a definitional instruction is not plain error so long as it is included in the issues instruction." *People v. O'Neal*, 2016 IL App (1st) 132284, ¶ 86 (citing *Rios*, 318 Ill. App. 3d at 362-64).

¶ 66    Moreover, in determining whether an error in jury instructions deprived a defendant of a fair trial, "[w]e must determine whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Parker*, 223 Ill. 2d at 501. Not only did the issues instruction inform the jury how to find defendant guilty, other instructions complimented the issues instruction. For one, pursuant to the defense's request, the trial court provided the jury with the definition of self-defense, as stated in IPI Criminal 4th No. 24-25.06. The trial court also provided the jury with an instruction on how to consider Hawthorne's prior robbery conviction as it related to defendant's claim of self-defense. See *People v. Lynch*, 104 Ill. 2d 194, 200 (1984). That instruction, based on IPI Criminal 4th No. 3.12X, stated in part: "In this case, the State must prove beyond a reasonable doubt the proposition that the defendant was not justified in using the force which he used." Thus, again, this instruction reiterated to the jury that the State had to prove beyond a reasonable doubt that defendant did not act in self-defense. Despite

the lack of the "without lawful justification" language in the definition of attempted first-degree murder, the jury instructions as a whole fully apprised the jury of the relevant legal principles.

¶ 67    Additionally, during the parties' closing arguments, both parties repeatedly informed the jury that, in order to convict defendant of attempted first-degree murder, it needed to find that the State proved beyond a reasonable doubt he was not justified in using the force he used. In fact, the State read the issues instruction to the jury nearly verbatim and highlighted that the self-defense proposition was the "crux" of the case. Defense counsel remarked that the State had "to prove *** that this wasn't self-defense" and then reiterated the point once again adding that the State had to prove that proposition beyond a reasonable doubt. Given that the instructions as a whole informed the jury that the State had to prove defendant was not justified in using self-defense beyond a reasonable doubt and both parties referenced this principle of law during closing argument, the jury was fully instructed on the law and the court's failure to include the "without lawful justification" language in the definitional instruction did not undermine the fairness of defendant's trial. See *Rios*, 318 Ill. App. 3d at 364 (finding the defendant was not deprived of a fair trial where the trial court failed "to include 'without lawful justification' language in the murder definition instruction" because the parties extensively discussed "the justification issue during both parties' closing arguments and the use of the appropriate language in the issues and self-defense instructions"). Consequently, defendant has failed to show that the trial court's jury instruction error rose to the level of plain error.

¶ 68                                   E. Cumulative Error

¶ 69    While defendant contended that each of the foregoing alleged errors individually warranted a reversal and remand for a new trial, he also contended that the errors cumulatively warranted a reversal and remand for a new trial. Axiomatically, if there is no individual error, there cannot be

cumulative error. See *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 77 ("[B]ecause we have found no individual errors, we reject defendant's cumulative error claim.").

¶ 70                                    III. CONCLUSION

¶ 71    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 72    Affirmed.